Filing # 259408885 E-Filed 10/16/2026 04:43:31 PM

IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

A.L.,

Plaintiff,

v.

ANTHEM INSURANCE COMPANIES, INC.,

Defendant.

_____________________________________________/

**COMPLAINT FOR DECLARATORY JUDGMENT FOR RECOVERY OF CONTRACTUAL INSURANCE BENEFITS PURSUANT TO ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**

Plaintiff, A.L. ("Plaintiff"), by and through undersigned counsel, files this Complaint against Defendant, ANTHEM INSURANCE COMPANIES, INC. ("Anthem" or "Defendant"), and alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action to recover benefits allegedly due under an employer-sponsored supplemental Critical Illness Insurance Policy issued by Defendant, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

2. Plaintiff purchased and maintained critical illness insurance coverage providing a $30,000 benefit for qualifying Invasive Cancer and a $7,500 benefit for qualifying Non-Invasive Cancer.

3. Plaintiff was diagnosed with breast cancer on February 13, 2025. The diagnosis was subsequently confirmed by pathological examination to include Grade 2 invasive ductal carcinoma, as well as a separate invasive lobular carcinoma component.



Accepted 10/20/2026 08:59 AM by the Clerk of the Circuit Court, St. Johns County, Florida, DIN: 5

4. Plaintiff's treating breast surgical oncologist confirmed the invasive nature of Plaintiff's malignancies through medical documentation, surgical pathology, and written correspondence submitted to Defendant.

5. Despite these findings, Defendant classified Plaintiff's cancer under the Policy's Non-Invasive Cancer benefit, paying only $7,500 and refusing to pay the remaining $22,500 sought by Plaintiff.

6. Defendant based its determination principally upon Plaintiff's Stage IA cancer classification, notwithstanding the Policy's separate description of Invasive Cancer as a malignancy involving invasion of normal tissue.

7. Plaintiff disputes Defendant's interpretation and application of the Policy and contends that the denial improperly fails to reconcile the Policy's tissue-invasion language, its cancer-staging provisions, and the objective pathological evidence.

8. Plaintiff exhausted the administrative appeals process. Defendant issued its final adverse benefit determination on February 20, 2026.

9. Plaintiff brings this action under 29 U.S.C. § 1132(a)(1)(B) to recover benefits allegedly due under the Policy, together with prejudgment interest, reasonable attorney's fees, costs, and other appropriate relief.

## II. PARTIES

10. Plaintiff, A.L., is a resident of St. Johns County, Florida, and was at all material times an insured participant or beneficiary under the Critical Illness Insurance Plan at issue.

11. Defendant, Anthem Insurance Companies, Inc., is an insurance company whose principal office is identified in the Certificate of Coverage as 220 Virginia Avenue, Indianapolis, Indiana 46204.

12. Defendant issued Group Critical Illness Insurance Policy No. 270017 to Intercontinental Exchange, Inc., the employer and policyholder, A.L. who resides in Jacksonville.

13. At all material times, Defendant was responsible for determining eligibility for benefits, interpreting the applicable insurance provisions, and paying benefits under the Policy.

14. Defendant made the adverse benefit determination challenged in this action and upheld that determination following Plaintiff's administrative appeal.

## III. JURISDICTION AND VENUE

15. This is an action for recovery of $22,500 in unpaid contractual insurance benefits, exclusive of interest, attorney's fees, and costs.

16. This Court has subject-matter jurisdiction pursuant to section 34.01, Florida Statutes, because the amount in controversy does not exceed $50,000, exclusive of interest, costs, and attorney's fees.

17. This Court also has concurrent subject-matter jurisdiction over Plaintiff's claim for benefits pursuant to 29 U.S.C. § 1132(e)(1), which permits actions brought under 29 U.S.C. § 1132(a)(1)(B) to be maintained in a state court of competent jurisdiction.

18. Plaintiff is a participant or beneficiary of an employee welfare benefit plan governed by ERISA and seeks to recover benefits due under the terms of that Plan.

19. Venue is proper in St. Johns County, Florida, pursuant to section 47.051, Florida Statutes, because, upon information and belief, Defendant is a foreign corporation doing business

in Florida and the contractual obligation to pay insurance benefits to Plaintiff was to be performed in St. Johns County, where Plaintiff resides.

20. Alternatively, venue is proper to the extent that the cause of action accrued in St. Johns County through Defendant's failure to pay benefits allegedly due to Plaintiff in that County.

21. Plaintiff has exhausted the applicable administrative remedies, and Defendant issued its final adverse benefit determination on February 20, 2026.

22. Plaintiff is entitled to seek judicial enforcement of her rights and recovery of benefits under the governing insurance Plan.

## IV. THE INSURANCE CONTRACT AND COVERAGE

19. Defendant issued Group Critical Illness Insurance Policy No. 270017 to Intercontinental Exchange, Inc., with an identified effective date of January 1, 2022. *See* Exh. A.

20. The Certificate of Coverage identifies Plaintiff's applicable benefit class as Class 02, covering eligible employees electing the $30,000 benefit.

21. The Policy provides voluntary supplemental insurance benefits upon the diagnosis of specified critical illnesses.

22. The Certificate identifies a $30,000 Coverage Amount for a Primary Insured under Plaintiff's elected benefit class.

23. Under the Benefit Schedule, the Policy provides payment of 100% of the Coverage Amount for Invasive Cancer and 25% of the Coverage Amount for Non-Invasive Cancer.

24. Accordingly, the scheduled benefit for Invasive Cancer is $30,000, whereas the scheduled benefit for Non-Invasive Cancer is $7,500.

25. The Policy's Critical Illness Benefit provision states that, when a Covered Person is diagnosed with a Critical Illness while insured under the Policy, Defendant will pay the applicable benefit determined by multiplying the Coverage Amount by the percentage shown in the Benefit Schedule.

26. The Policy defines Invasive Cancer, in relevant part, by reference to a malignancy characterized by uncontrolled and abnormal malignant-cell growth and spread, with invasion of normal tissue, as diagnosed by an appropriately qualified physician.

27. The Policy further states that Invasive Cancer includes cancers classified as Stage 2 through Stage 4, or **their equivalent**.

28. The Policy also provides that Invasive Cancer does not include a condition considered Non-Invasive Cancer.

29. Separately, the Policy defines Non-Invasive Cancer to include Stage I cancer or its equivalent, as well as certain qualifying carcinoma-in-situ diagnoses.

30. Plaintiff acknowledges that the Policy's cancer classifications contain express staging provisions and that Defendant relied upon those provisions in denying the additional benefit.

31. Plaintiff contends, however, that the Policy must be interpreted as a whole, including the language describing invasive malignancy and the relationship between its medical and staging classifications.

32. Plaintiff further contends that the interaction between the Policy's tissue-invasion language and its classification of Stage I cancers presents an interpretive dispute that must be resolved under the applicable principles governing ERISA benefit claims.

33. Plaintiff was insured under the Policy at the time of the relevant cancer diagnosis, as reflected by Defendant's acceptance and partial payment of her claim.

## V. PLAINTIFF'S DIAGNOSIS OF INVASIVE BREAST CANCER

34. Plaintiff underwent breast imaging and diagnostic evaluation following the identification of suspicious abnormalities in her right breast.

35. Subsequent diagnostic testing identified a suspicious breast mass requiring additional pathological evaluation.

36. On February 13, 2025, a right breast ultrasound-guided core needle biopsy was performed.

37. The pathology established a diagnosis of invasive ductal carcinoma, Grade 2 under the Nottingham grading system.

38. The pathology further documented malignant tumor cells with invasive characteristics, distinguishing the invasive ductal carcinoma from noninvasive or in-situ breast abnormalities.

39. The initial core biopsy identified a 7-millimeter dimension of tumor within the sampled tissue.

40. Plaintiff subsequently underwent a central lumpectomy and sentinel lymph node biopsy on February 20, 2025.

41. The surgical pathology documented invasive breast carcinoma and an invasive tumor dimension of 17 millimeters and documented Grade 2 invasive ductal carcinoma.

42. Plaintiff's treating physician subsequently described the surgical findings as multifocal breast cancer, including a **1.4-centimeter invasive ductal carcinoma** and a separate 1.7-millimeter **invasive** lobular carcinoma.

43. These findings establish that Plaintiff's breast malignancy was not confined exclusively to carcinoma in situ.

44. The existence of separate invasive ductal and invasive lobular carcinoma components was medically significant and confirmed through pathological evaluation.

45. Plaintiff's Grade 2 designation refers to the histological grade of her breast carcinoma under the Nottingham grading system, whereas the Stage IA classification refers to the clinical or pathological extent of the malignancy. These classifications are medically distinct and are not interchangeable. Plaintiff's Stage IA designation does not negate the pathological confirmation that her breast cancer was invasive.

46. Plaintiff relies upon the pathological findings to establish the invasive nature of her malignancies and to support her interpretation of the Policy's coverage provisions.

47. Plaintiff filed a claim for invasive carcinoma. Defendant issued an Explanation of Benefits dated December 15, 2025, reflecting payment of $7,500 under the Non-Invasive Cancer benefit.

48. Defendant denied payment of the remaining $22,500 sought under the Invasive Cancer benefit.

49. Defendant's stated reason was that Plaintiff's cancer did not satisfy its interpretation of the Invasive Cancer definition because the malignancy was not classified as Stage 2 or higher.

50. Defendant thereby treated the Stage IA classification as controlling the benefit determination, notwithstanding the pathological diagnosis of invasive carcinoma and Grade 2 invasive carcinoma.

51. Plaintiff's diagnosis and treatment were documented by her treating breast surgical oncologist, Laila Samaiian, M.D., of Baptist MD Anderson Cancer Center.

52. On January 8, 2026, Dr. Samaiian authored a letter addressed to Anthem's Cancer Policy Review Department.

53. The letter confirmed that Plaintiff had been diagnosed with invasive ductal carcinoma of the right breast.

54. Dr. Samaiian specifically described the malignancy as Grade 2 invasive ductal carcinoma with associated DCIS.

55. Dr. Samaiian identified multifocal breast cancer consisting of invasive ductal carcinoma and invasive lobular carcinoma components.

56. On January 9, 2026, Plaintiff submitted Dr. Samaiian's January 8, 2026 letter to Defendant in connection with the administrative appeal of the Critical Illness Insurance benefit determination.

57. Defendant therefore received the physician's detailed description of Plaintiff's invasive malignancies before issuing its final adverse benefit determination.

58. The letter constituted material medical evidence relevant to the proper interpretation and application of the Policy's cancer definitions.

59. Plaintiff timely appealed Defendant's partial denial of benefits.

60. Defendant's final appeal determination identifies January 5, 2026, as the date it received Plaintiff's appeal request.

61. Plaintiff sought payment of the additional $22,500 representing the difference between the Invasive Cancer benefit ad the amount already paid.

62. On January 9, 2026, Plaintiff submitted Dr. Samaiian's January 8, 2026 letter as additional supporting medical evidence.

63. The letter confirmed the diagnosis of invasive ductal carcinoma and identified a separate invasive lobular carcinoma component.

64. Defendant had the opportunity to consider the medical documentation and Plaintiff's contentions concerning the invasive nature of the malignancy.

65. On February 20, 2026, Defendant issued its final adverse benefit determination upholding the partial denial.

66. Defendant maintained that its payment of $7,500 was consistent with the Policy's Non-Invasive Cancer benefit.

67. The final determination advised Plaintiff of her right to bring a civil action under ERISA § 502(a)(1)(B).

68. Plaintiff has exhausted the administrative appeal procedure made available by Defendant.

69. Plaintiff contends that Defendant improperly interpreted and applied the Policy's Invasive Cancer and Non-Invasive Cancer provisions.

70. The Policy expressly describes Invasive Cancer by reference to a malignancy involving invasion of normal tissue.

71. Plaintiff's medical records and treating physician's letter establish the existence of pathologically confirmed invasive breast malignancies.

72. Plaintiff contends that Defendant's interpretation fails to give adequate independent effect to the Policy's description of tissue invasion and the confirmed medical diagnosis.

73. Plaintiff further contends that the Policy's use of both tissue-invasion terminology and staging classifications creates a material interpretive question regarding the scope of the Invasive Cancer benefit.

74. Plaintiff contends that the proper construction of the entire Policy, including the relevant definitions, benefit schedule, exclusions, and any applicable master policy provisions, supports entitlement to the additional benefit.

75. Alternatively, to the extent the Court determines that the governing provisions are ambiguous, Plaintiff requests application of the interpretive principles appropriate under ERISA and the applicable standard of review.

76. The Certificate includes a provision granting Defendant discretionary authority to determine eligibility for benefits and interpret Policy provisions.

77. To the extent de novo review applies, Plaintiff contends that the correct interpretation of the Policy entitles her to the full Invasive Cancer benefit.

78. To the extent deferential review applies, Plaintiff contends that Defendant's determination was unreasonable because it failed to adequately reconcile the tissue-invasion language with the medical evidence and the other relevant provisions of the Policy.

79. Plaintiff further contends that Defendant's final determination did not adequately explain why the confirmed invasive malignancies failed to satisfy the Policy's tissue-invasion description beyond its reliance on the Stage IA classification.

80. Defendant's interpretation and resulting refusal to pay the additional benefit are the subject of this action.

**COUNT I – DECLARATORY JUDGMENT RECOVERY OF BENEFITS DUE UNDER THE TERMS OF THE PLAN 29 U.S.C. § 1132(a)(1)(B)**

81. Plaintiff realleges and incorporates Paragraphs 1 through 80 as though fully set forth herein.

82. Plaintiff was a covered participant or beneficiary under the Critical Illness Insurance Plan.

83. Plaintiff seeks recovery of the additional $22,500 in insurance benefits allegedly due under the terms of Group Critical Illness Insurance Policy No. 270017, together with prejudgment interest, reasonable attorney's fees and costs under 29 U.S.C. § 1132(g)(1), and such other relief as the Court deems appropriate.

84. Defendant issued and insured the Policy and was responsible for the benefit determination challenged in this action.

85. The Policy established the contractual terms under which Defendant was required to pay Critical Illness Insurance benefits.

86. The Policy definition of Invasive Cancer States:

> **Invasive Cancer** means a condition Diagnosed as the presence of a malignancy characterized by the uncontrolled and abnormal growth and spread of malignant cells with invasion of normal tissue as diagnosed by a Physician, who is board certified in the medical specialty that is appropriate for the type of cancer involved.
>
> Invasive Cancer includes **any cancer classified as Stage 2 through 4**, or **its equivalent**.
>
> Invasive Cancer does not include a Diagnosis of Invasive Cancer for:
>
> 1) any tumor in the presence of human immuno-deficiency virus;
> 2) any non-melanoma skin cancer; or
> 3) any condition that is considered Non-Invasive Cancer.

*See* Pg. 10, Policy.

87. Plaintiff was diagnosed with breast cancer while insured under the Policy.

88. The pathological findings established Grade 2 invasive ductal carcinoma and a separate invasive lobular carcinoma component.

89. Plaintiff submitted a claim seeking the $30,000 Invasive Cancer benefit.

90. Defendant paid $7,500 under the Non-Invasive Cancer benefit and denied the remaining $22,500.

91. Plaintiff timely appealed the determination and submitted additional medical evidence supporting the invasive nature of her malignancies.

92. Defendant upheld its partial denial on February 20, 2026.

93. Plaintiff contends that Defendant incorrectly interpreted and applied the governing Policy provisions and that the additional $22,500 is due under the proper construction of the Plan.

94. Plaintiff further contends that Defendant's determination was erroneous under de novo review or, to the extent deferential review applies, unreasonable under the governing Plan terms and relevant evidence.

95. Defendant has failed and refused to pay the additional benefits claimed by Plaintiff.

96. Plaintiff has exhausted the applicable administrative remedies.

97. As a result of Defendant's determination, Plaintiff has been deprived of $22,500 in insurance benefits she contends are due under the Policy.

98. Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff seeks recovery of those benefits and enforcement of her rights under the Plan and attorneys fees and costs.

99. Plaintiff requests judgment against Defendant for the benefits due under the Plan, after credit for the $7,500 previously paid.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, A.L., respectfully requests that this Court enter judgment in her favor and against Defendant, ANTHEM INSURANCE COMPANIES, INC., and:

A. Determine that Defendant's denial of the additional Invasive Cancer benefit was erroneous under the applicable ERISA standard of review;

B. Determine that Plaintiff is entitled to the full $30,000 Invasive Cancer benefit under the governing Plan;

C. Award Plaintiff $22,500 in unpaid benefits, after credit for the $7,500 previously paid;

D. Award prejudgment interest on the unpaid benefits at a rate determined by the Court;

E. Award reasonable attorney's fees and taxable costs pursuant to 29 U.S.C. § 1132(g)(1), to the extent authorized by law;

F. Alternatively, if the Court determines that further administrative consideration is required, remand the claim for a full and fair review consistent with the Court's findings;

G. Award post judgment interest pursuant to 28 U.S.C. § 1961; and

H. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8925 SW 148 Street, Suite 216
Miami, FL 33176
Phone: (305) 677-2292
Fax: (305) 677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

**By: /s/ Maria T. Santi**
MARIA T. SANTI, ESQUIRE
Florida Bar No.: 117564

# EXHIBIT “A”

Anthem



Voluntary
Critical Illness Insurance

# Certificate of Coverage

**Plan Sponsor:** Intercontinental Exchange, Inc
**Policy:** 270017
**Class:** 02
**Class Description:** All Eligible Employees Electing $30,000 Benefit

**anthem.com**

Anthem Blue Cross and Blue Shield is the trade name of: In Colorado: Rocky Mountain Hospital and Medical Service, Inc. HMO products underwritten by HMO Colorado, Inc. In Indiana: Anthem Insurance Companies, Inc. In Georgia: Anthem Insurance Companies, Inc. In Kentucky: Anthem Health Plans of Kentucky, Inc. In Missouri (excluding 30 counties in the Kansas City area): RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. In Nevada: Rocky Mountain Hospital and Medical Service, Inc. HMO products underwritten by HMO Colorado, Inc., dba HMO Nevada. In Ohio: Community Insurance Company. In Virginia: Anthem Health Plans of Virginia, Inc. trades as Anthem Blue Cross and Blue Shield in Virginia, and its service area is all of Virginia except for the City of Fairfax, the Town of Vienna, and the area east of State Route 123. In Wisconsin: Blue Cross Blue Shield of Wisconsin (BCBSWI), underwrites or administers PPO and indemnity policies and underwrites the out of network benefits in POS policies offered by Compcare Health Services Insurance Corporation (Compcare) or Wisconsin Collaborative Insurance Corporation (WCIC). Compcare underwrites or administers HMO or POS policies; WCIC underwrites or administers Well Priority HMO or POS policies. Independent licensees of the Blue Cross and Blue Shield Association. ANTHEM is a registered trademark of Anthem Insurance Companies, Inc.

## GROUP CRITICAL ILLNESS INSURANCE CERTIFICATE

Anthem Insurance Companies, Inc.
220 Virginia Avenue
Indianapolis, IN 46204

**Anthem Insurance Companies, Inc.**

**Policyholder:** Intercontinental Exchange, Inc
**Policy Number:** 270017
**Policy Effective Date:** January 1, 2022
**Policy Anniversary:** January 1

We have issued the Policy to the Policyholder. The Policy is delivered in and governed by the laws of the state of Georgia. The provisions of the Policy that are important to the Covered Person(s) are summarized in this Certificate, consisting of this form and any additional forms which have been made a part of this Certificate. This Certificate replaces any other Certificate We may have previously issued to the Primary Insured under the Policy. The Policy alone is the only contract under which payment will be made. Any difference between the Policy and this Certificate will be settled according to the provisions of the Policy on file with Us at Our Home office. The Policy may be inspected at the office of the Policyholder.

Signed for Anthem Insurance Companies, Inc.

Pamela J. Stahl
President, Anthem Insurance Companies, Inc.

**THIS IS A LIMITED BENEFIT CERTIFICATE: This Certificate provides limited or supplemental coverage. It pays benefits ONLY upon the occurrence and Diagnosis of a Critical Illness with the exception of the Health Screening Benefit. This Certificate does not provide benefits for any other disease, sickness or incapacity. Benefits provided are supplemental and are not intended to substitute for medical coverage or disability insurance.**

**THIS IS NOT A MEDICARE SUPPLEMENT CONTRACT. If You are eligible for Medicare, review the Guide to Health Insurance for People With Medicare available from Us.**

**READ YOUR CERTIFICATE CAREFULLY:** You have a 30 day right from the Primary Insured's Coverage Effective Date to examine Your Certificate. If You are not satisfied, You may return it to Us within 30 days from the date You received Your Certificate. In that event, We will consider it void from its effective date and any premiums paid will be refunded. Any claims paid under the Policy during the initial 30 day period will be deducted from the refund.

*A note on capitalization in this Certificate:*
Capitalization of a term, not normally capitalized according to the rules of standard punctuation, indicates a word or phrase that is a defined term in the Policy or refers to a specific provision contained herein.

**Anthem Blue Cross and Blue Shield is the trade name of Anthem Insurance Companies, Inc. Independent licensee of the Blue Cross and Blue Shield Association. ANTHEM is a registered trademark of Anthem Insurance Companies, Inc.**

## TABLE OF CONTENTS

**Section: .................................................. Page:**

Benefit Schedule .................................................. 3

Definitions .................................................. 6

Eligibility & Effective Dates .................................................. 14

Termination of Coverage .................................................. 16

Continuation .................................................. 17

Critical Illness Benefits .................................................. 20

Exclusions .................................................. 21

Claim Provisions .................................................. 22

General Provisions .................................................. 24

## BENEFIT SCHEDULE

**Eligible Class(es)**
Actively at work Employees who are scheduled to work at least 30 hours per week and who have satisfied any applicable eligibility waiting periods as defined by the policyholder.

**Policy Age Limit:** 85

**Individual Grace Period:** 31 days

**Cost of Coverage:**
Contributory – You must contribute toward the cost of coverage.

**Coverage Amount:**

| | |
|---|---|
| **Primary Insured:** | $30,000 |
| **Spouse or Partner:** | $15,000 |
| **Dependent Child(ren):** | $15,000 |

**Guaranteed Issue Amount:** $30,000

**Primary Insured Coverage Maximum**:
You may receive multiple Critical Illness Benefit payments and Recurrence Benefit payments until a maximum of 2500% of the Primary Insured's Critical Illness Coverage Amount is reached in Your lifetime under the Policy. The Coverage Maximum does not include any Additional Critical Illness Benefits. In no event will Your Coverage Maximum exceed $250,000.

**Spouse or Partner Coverage Maximum**:
Your Spouse or Partner may receive multiple Critical Illness Benefit payments and Recurrence Benefit payments until a maximum of 2500% of the Spouse's or Partner's Critical Illness Coverage Amount is reached in Your Spouse's or Partner's lifetime under the Policy. The Coverage Maximum does not include any Additional Critical Illness Benefits. In no event will your Spouse's or Partner's Coverage Maximum exceed $250,000.

**Child(ren) Coverage Maximum:**
Each Child may receive multiple Critical Illness Benefit payments and Recurrence Benefit payments until a maximum of 2500% of the Child's Coverage Amount is reached while covered as a Dependent Child under the Policy. The Coverage Maximum does not include any Additional Critical Illness Benefits. In no event will Your Child's Coverage Maximum exceed $250,000.

## CRITICAL ILLNESS BENEFITS

| **Critical Illnesses** | **Percentage of Coverage Amount** |
| --- | --- |
| **Cancer Benefits** | |
| Invasive Cancer | 100% |
| Non-Invasive Cancer | 25% |
| Benign Brain Tumor | 100% |
| **Vascular Benefits** | |
| Heart Transplant | 100% |
| Heart Attack (Myocardial Infarction) | 100% |
| Stroke | 100% |
| Coronary Artery Bypass Graft | 25% |
| **Other Specified Critical Illness Benefits** | |
| Coma | 100% |
| Paralysis | 100% |
| Major Organ Transplant | 100% |
| End Stage Renal Disease | 100% |
| Loss of Hearing | 100% |
| Loss of Speech | 100% |
| Loss of Vision | 100% |
| **Neurological Benefits** | |
| Advanced Parkinson’s Disease | 100% |
| Amyotrophic Lateral Sclerosis (ALS or “Lou Gehrig’s Disease”) | 100% |
| Advanced Multiple Sclerosis | 100% |
| Advanced Alzheimer’s Disease | 100% |
| **Child-Specified Benefits** | |
| Muscular Dystrophy | 25% |
| Cerebral Palsy | 25% |
| Cystic Fibrosis | 25% |
| Spina Bifida | 25% |
| Congenital Heart Disease | 25% |

Each covered Critical Illness Benefit listed will only be paid once for each Covered Person.

| **Recurrence Benefit** | **Percentage of Original Benefit Amount** |
| --- | --- |
| Invasive Cancer | 100% |
| Benign Brain Tumor | 100% |
| Heart Transplant | 100% |
| Heart Attack (Myocardial Infarction) | 100% |
| Stroke | 100% |
| Coma | 100% |
| Major Organ Transplant | 100% |

Subject to the Covered Person’s coverage maximum shown above, the Recurrence Benefit is only payable if a Critical Illness Benefit has been paid for the same Critical Illness. In order to receive a Recurrence Benefit, all other conditions stated in the Recurrence Benefit provision must be satisfied. Only one Recurrence Benefit is payable for each covered benefit.

## ADDITIONAL CRITICAL ILLNESS BENEFITS

| Benefits | Coverage Amount |
|---|---|
| Health Screening Benefit | $50 |
| Skin Cancer Benefit | $250 |

## DEFINITIONS

**Actively at Work, Active Work** means that an Employee is:

1) performing all the regular duties of his/her job for the Policyholder in the usual way for 30 or more hours each week; and
2) receiving compensation from the Policyholder for work performed.

An Employee is considered actively at work on any day that is not his/her regular scheduled workday (e.g., vacation or holiday) as long as the Employee was actively working on his/her last preceding regular scheduled workday.

**Additional Enrollment Event** means a period of time designated for enrollment under the Policy, other than an Annual Enrollment Period, as agreed to in writing by Our authorized representative in our Home Office.

**Advanced Alzheimer's Disease** means a condition Diagnosed as Alzheimer's disease that has progressed to a classification of Stage 6 or greater of the Functional Assessment Staging Test (FAST), or equivalent test. Diagnosis must be made by a Physician who is a board-certified neurologist, and must be supported by neurological examination and cognitive testing for the involved condition/illness. There must be permanent clinical loss of the ability to do all of the following:

1) remember, reason, and perceive; and
2) understand, express and give effect to ideas.

Other types of dementia are not included in this definition. The initial Diagnosis of Alzheimer's disease must occur while the Covered Person is insured under the Policy.

**Advanced Multiple Sclerosis ("MS")** means a condition Diagnosed as the occurrence of at least two episodes of well-defined neurological abnormalities, with objective evidence of lesions that are characteristic of MS at more than one site within the central nervous system. Advanced Multiple Sclerosis must be Diagnosed by a Physician who is a board certified neurologist and the Diagnosis must be supported by modern imaging, investigative techniques and/or analysis of cerebrospinal fluid consistent with the Diagnosis.

The initial Diagnosis of Advanced MS must occur while the Covered Person is covered under the Policy.

**Advanced Parkinson's Disease** means a condition Diagnosed as Parkinson's Disease which has progressed to a classification of Stage 4 or greater. Diagnosis must be made by a board certified or board eligible neurologist based on abnormal findings from neurological examination, cognitive testing, and results of imaging studies. There must be permanent clinical impairment of motor function with associated tremor, muscle rigidity and postural instability. Other Parkinsonian syndromes are not included in this definition.

The initial Diagnosis of Advanced Parkinson's Disease must occur while the Covered Person is covered under the Policy.

**Amyotrophic Lateral Sclerosis (ALS or "Lou Gehrig's Disease")** means a condition Diagnosed as progressive degenerative motor neuron disease, marked by muscular weakness and atrophy with spasticity and hyperreflexia due to a degeneration of anterior horn cells of the spinal cord and cranial nerves and is Middle Stage according to the Muscular Dystrophy Association. Other motor neuron diseases are not considered to be ALS. ALS must be Diagnosed by a Physician who is a board certified neurologist based on generally acceptable principles of medicine.

The initial Diagnosis of ALS must occur while the Covered Person is covered under the Policy.

**Aneurysm** means a condition Diagnosed as a localized, blood-filled dilation of a blood vessel caused by disease or weakening of the vessel wall in the brain, carotid arteries, or aorta for which surgical correction has been performed or is Medically Necessary. Aorta refers to the thoracic and abdominal aorta, but not its branches. Diagnosis must be supported by medical records which include radiographically specific studies such as, but not limited to, angiography, CT scan, MRI, or ultrasound.

**Angioplasty/Stent** means a condition Diagnosed as heart disease that has progressed such that reconstitution or recanalization of a blood vessel is Medically Necessary. Angioplasty surgery may involve balloon dilation, mechanical stripping of intima, forceful injection of fibrinolytics or placement of a stent.

**Annual Enrollment Period** means a period of time during which annual benefits enrollment occurs each year as determined by the Policyholder.

**Benign Brain Tumor** means a condition Diagnosed as a non-malignant tumor or cyst in the brain, cranial nerves or meninges within the skull with a minimum size of 1 cm, resulting in either surgical removal or permanent neurological deficit with persisting clinical symptoms. The tumor, including its size, should be documented on an MRI of the brain (with and without contrast) or by pathological diagnosis. If the Covered Person is unable to undergo an MRI of the brain (the study is deemed inappropriate for safety reasons such as the presence of metallic foreign bodies; mechanical reasons such as body habitus; or unavailability), then the tumor should be documented by a CT scan of the head, with and without contrast.

Benign Brain Tumor does not include:
1) tumors in the pituitary gland; or
2) angiomas.

**Cerebral Palsy** means a condition Diagnosed as a non-progressive neurological defect affecting muscle control characterized by spasticity and incoordination of movements. Other similar conditions such as degenerative nervous disorders, genetic diseases, muscle diseases, metabolic disorders, nervous system tumors, coagulation disorders, or other injuries or disorders which delay early development, but can be outgrown, are not included in this definition.

The Diagnosis of Cerebral Palsy must be made by a Physician board certified in neurology or a pediatrician who specializes in neurodevelopmental disorders.

The initial Diagnosis of Cerebral Palsy must occur while the Covered Person is covered under the Policy.

**Certificate** means this document, which explains the insurance benefits provided, to whom and how benefits are payable and exclusions and limitations that apply to coverage.

**Change in Family Status** means one of the following events:
1) You get married or enter into a relationship with a person who satisfies the definition of Partner;
2) You and Your Spouse divorce or You and Your Partner legally terminate Your relationship;
3) Your Spouse or Partner dies;
4) You acquire a child who satisfies the definition of Dependent Child;
5) Your child no longer satisfies the definition of a Dependent Child or dies; or
6) Your Spouse or Partner is no longer employed, which results in a loss of critical illness insurance sponsored by the Spouse's or Partner's employer for You or any Dependent(s).

**Coma** means a condition Diagnosed as a continuous state of profound unconsciousness with no reaction to external stimuli which is not the result of a Stroke. The Coma must:
1) be due to disease;
2) be Diagnosed while the Covered Person is covered under the Policy;
3) last for a period of 7 or more consecutive days; and
4) be rated/classified by at least one of the following scales:
    a) Rancho Los Amigos Scale (RLAS) as a level I or II;
    b) Glasgow Coma Scale values of 3 through 5; or

c) the disability rate scale with values of 22 through 29.

The condition must require mechanical ventilation for respiratory assistance. For purposes of the Policy, Coma does not include a medically induced coma or a coma caused or contributed to by alcohol or substance abuse.

**Congenital Heart Disease** means a condition Diagnosed as at least one of the following covered heart conditions:
1) coarctation of the aorta;
2) Ebstein's anomaly;
3) Eisenmenger syndrome;
4) tetralogy of Fallot;
5) transposition of the great vessels;
6) total anomalous pulmonary venous connection;
7) atresia of any heart valve;
8) single ventricle;
9) hypoplastic left heart syndrome;
10) truncus arteriosus;
11) double outlet left or right ventricle; or
12) any other congenital cardiac condition that requires life-saving surgery to survive.

It also means a specific condition for which it is Medically Necessary that open heart surgery be performed.

The Diagnosis of Congenital Heart Disease must be made by a Physician board certified in cardiology and must be supported by cardiac imaging. If the Covered Person is determined to be too ill to undergo surgery, but otherwise meets the criteria for the need for the surgery, the surgery requirement will be waived.

**Contributory Coverage** means coverage for which You are required to contribute toward the cost.

**Coronary Artery Bypass Graft** means a condition Diagnosed as heart disease that necessitates heart surgery to correct narrowing or blockage of one or more coronary arteries with bypass grafts. The surgery must be Medically Necessary as determined by a Physician board certified in cardiology.

**Coverage Amount** is the dollar amount You or Your Dependents are covered for a Critical Illness.

**Covered Person** means the Employee and any Dependent(s) who is/are currently insured under the Policy and this Certificate.

**Critical Illness** means any of the conditions shown in the Benefit Schedule.

**Cystic Fibrosis** means a condition Diagnosed as a recessive genetic disease affecting the lungs and pancreas, liver, and intestine. It is characterized by abnormal transport of chloride and sodium across the epithelium leading to thick viscous secretions. The Diagnosis of Cystic Fibrosis must be confirmed by a positive sweat test.

The initial Diagnosis of Cystic Fibrosis must occur while the Covered Person is covered under the Policy.

**Dependent, Dependents** means an Employee's Spouse or Partner and Dependent Child(ren).

**Dependent Child(ren)** means:
1) an Employee's or Spouse's or Partner's natural child, legally adopted child or stepchild;
2) a child placed into the Employee's or Spouse's or Partner's custody for adoption (regardless of whether the adoption has become final);

3) a child for whom the Employee or Spouse or Partner is ordered by a court or administrative order to provide coverage regardless of whether he/she is the custodial or non-custodial parent;
4) any other child for whom the Employee or Spouse or Partner has been appointed legal guardian; or who is/are under 26 years of age.

If a child is age 26 or older and is:
1) incapable of self-sustaining employment because of a mental or physical disability;
2) chiefly dependent on the Employee, or Spouse or Partner for financial support and maintenance; and proof has been provided of his/her disability upon Our request, that child will continue to be a dependent child until these conditions cease to exist.

**Diagnosed, Diagnosis** means the definitive establishment of a Critical Illness through the use of clinical or laboratory findings. The Diagnosis must be made by a Physician who is a board certified specialist where required in the Policy.

**Employee** means a person who:
1) is a citizen or legal resident of the United States (including its territories and protectorates); or
2) is lawfully and legally able to work in the United States pursuant to applicable law(s); and
3) works for the Policyholder on a regular basis in the usual course of the Policyholder's business.

This definition does not include a person working for the Policyholder:
1) on a temporary, leased or seasonal basis;
2) as an independent contractor (including persons for whom income is reported on a 1099 form);
3) subject to the terms of a leasing agreement between the Policyholder and a leasing organization; or
4) who resides outside the United States for a period in excess of 12 months, unless written approval has been received from Us.

**End Stage Renal Disease** means a condition Diagnosed as kidney disease which has resulted in permanent and irreversible failure of both kidneys requiring regular treatment by either hemodialysis or peritoneal dialysis on a no less than weekly basis, or for which kidney transplant is Medically Necessary.

**Family Member** means a Covered Person's Spouse (current and former); Partner; child; sibling; parent; grandparent; grandchild; aunt; uncle; first cousin; nephew; niece; or the spouse or Partner of such individuals. This includes adopted, in-law and step-relatives, and anyone living in the Covered Person's household.

**Heart Attack** means a condition Diagnosed as acute myocardial infarction resulting in the death of a portion of the heart muscle (myocardium) due to a blockage of one or more coronary arteries and resulting in the loss of the normal function of the heart.

The Diagnosis must be made by a Physician board certified in cardiology. Significant electrocardiogram (EKG) changes must be seen and the Diagnosis of an acute myocardial infarction (heart attack) with resulting loss of normal heart function must be confirmed by one or both of the following:
1) a clinical picture of myocardial infarction with cardiac enzyme changes found in blood (elevated DK-MB isoenzyme fraction or elevated troponins);
2) confirmatory imaging tests such as a nuclear imaging test or echocardiogram that is consistent with a myocardial infarction.

Heart Attack does not include:
1) established (old) myocardial infarction;
2) congestive heart failure;
3) atherosclerosis;
4) angina;
5) coronary artery disease;
6) or any other dysfunction of the cardiovascular system;

7) cardiac arrest not caused by a myocardial infarction; or
8) heart attacks that occur during clinical procedures.

In the event of death, an autopsy confirmation and/or death certificate identifying Heart Attack as the cause of death will be accepted.

**Heart Transplant** means:
1) a condition Diagnosed as heart failure due to heart disease and for which a Covered Person is placed on a national transplant list such as UNOS; and
2) the irreversible failure of the Covered Person's heart has occurred for which a Physician has determined that the replacement of such organ with a human donor heart is Medically Necessary.

If the Covered Person is too ill for a transplant, but otherwise meets the criteria to be placed on the UNOS or other national transplant list, the placement on such list will be waived.

**Home Office** means Our office at 220 Virginia Avenue, Indianapolis, IN 46204.

**Individual Grace Period** means a period of time from the Premium Due Date for payment of each premium due after the initial premium. The Covered Person's insurance will be continued during the Individual Grace Period.

The Individual Grace Period will not continue coverage beyond a date shown in the Termination provision.

The Individual Grace Period is shown in the Benefit Schedule.

**Invasive Cancer** means a condition Diagnosed as the presence of a malignancy characterized by the uncontrolled and abnormal growth and spread of malignant cells with invasion of normal tissue as diagnosed by a Physician, who is board certified in the medical specialty that is appropriate for the type of cancer involved.

Invasive Cancer includes any cancer classified as Stage 2 through 4, or its equivalent.

Invasive Cancer does not include a Diagnosis of Invasive Cancer for:
1) any tumor in the presence of human immuno-deficiency virus;
2) any non-melanoma skin cancer; or
3) any condition that is considered Non-Invasive Cancer.

**Loss of Hearing** means a condition Diagnosed as the irreversible loss of hearing for all sounds in both ears, due to disease. The Diagnosis of irreversible loss of hearing must be made by a licensed professional or specialist in the applicable field of medicine and established by an audiometric and auditory threshold test. The auditory threshold cannot be more than 90 decibels in both ears while utilizing a hearing aid.

The loss of hearing must occur after the Covered Person becomes insured under the Policy.

**Loss of Speech** means a condition Diagnosed as the irreversible loss of ability to speak, due to disease. The Diagnosis of irreversible loss of speech must be made by a licensed professional or specialist in the applicable field of medicine and must include documented evidence of the loss for at least 12 months.

The loss of speech must occur after the Covered Person becomes insured under the Policy.

**Loss of Vision** means a condition Diagnosed as the irreversible loss of vision in both eyes due to disease. The Diagnosis of irreversible loss of vision must be made by a licensed professional or specialist in the applicable field of medicine and must indicate that corrective visual acuity is equal to or worse than 20/200 in both eyes or the field of vision is less than 20 degrees in both eyes.

The irreversible loss of vision must occur after the Covered Person becomes insured under the Policy.

**Major Organ Transplant** means:
1) a Diagnosis of organ failure due to disease of the affected organ and for which a Covered Person is placed on a national transplant list such as UNOS; and
2) the irreversible failure of the Covered Person's lung, pancreas or any combination thereof, for which a Physician has determined that the complete replacement of such organ with an entire organ from a human donor is Medically Necessary; or
3) the irreversible failure of the Covered Person's liver for which a Physician has determined that the complete or partial replacement of the liver with a liver or liver tissue from a human donor is Medically Necessary. For this type of transplant, the requirement of placement on a national transplant list, such as UNOS, is specifically null in cases of live donor transplant.

Organs transplanted simultaneously with the heart are covered under Heart Transplant.

If the Covered Person is too ill for a transplant, but otherwise meets the criteria to be placed on the UNOS or other national transplant list, the placement requirement will be waived.

**Medically Necessary** means:
1) recommended by a Physician acting within the scope of his or her license; and
2) consistent with currently accepted medical practice.

**Muscular Dystrophy** means a condition Diagnosed as one of a group of muscle diseases characterized by progressive skeletal muscle weakness, defects in muscle proteins, and the death of muscle cells and tissue. The Diagnosis of Muscular Dystrophy must be confirmed by electromyography and muscle biopsy. Spinal muscular atrophy does not satisfy the definition of Muscular Dystrophy.

**Non-Contributory Coverage** means coverage for which You are not required to contribute toward the cost.

**Non-Invasive Cancer** means a condition Diagnosed as:
1) Stage I or its equivalent; or
2) carcinoma in situ classified as TisN0M0, for which radiotherapy, intravenous chemotherapy, or surgical procedures are Medically Necessary to control or cure the disease.

Non-Invasive Cancer does not include a condition Diagnosed as:
1) any benign tumor, dysplasia, intraepithelial neoplasia or pre-malignant growth;
2) any tumor in the presence of human immuno-deficiency virus;
3) any non-melanoma skin cancer; or
4) any melanoma in situ classified as TisN0M0 under TNM staging.

**Paralysis** means a condition Diagnosed as the complete and permanent loss of function of two or more limbs due to disease. Paralysis as a result of Stroke is excluded. The Diagnosis of Paralysis must include documented evidence of the illness that caused the Paralysis. As used herein, "limb" means an arm or leg.

The Paralysis must occur after the Covered Person becomes insured under the Policy.

**Partner** means an individual who is a partner to an Employee in a civil union or domestic partnership, or other relationship as recognized and allowed by applicable federal law, state law, or law of the county, city or local government in the Employee's jurisdiction of residence, if:
1) an Employee provides acceptable evidence that the requirements of the jurisdiction in which he/she resides for the establishment of the relationship have been met;
2) an Employee submits a written declaration of partnership signed by both parties acceptable to Us; or

3) the Employee and his/her partner satisfy the Policyholder's requirements for such partnerships.

**Physician** means a person who is:
1) a doctor of medicine, osteopathy, psychology or where required by state law, any other legally qualified practitioner of healing art;
2) licensed to practice in the jurisdiction where care is being given;
3) operating within the scope of his or her license; and
4) not the Covered Person or a Family Member.

**Policy** means the policy that We issued to the Policyholder under the Policy Number shown on the face page.

**Policyholder** means the Employer.

**Primary Insured** means an Employee who is currently insured under the Policy and this Certificate. (See also You, Yours.) This definition also includes a Spouse or Partner who has elected to continue coverage under the Extended Continuation provision.

**Prior Policy** means the Critical Illness insurance policy carried or sponsored by the Employer or an Employer acquired by the Policyholder on the day before the Policy Effective Date and will only include the coverage which is transferred to Us.

**Skin Cancer** means basal cell carcinoma and squamous cell carcinoma.

**Spina Bifida** means a congenital defect, Diagnosed by a Physician, caused by failure of the spine to close properly allowing the spinal cord and its protective covering (meninges) to protrude through the skin, characterized by varying degrees of the following: hydrocephalus, paralysis, bowel problems and bladder problems relating to control of urine.

For purposes of the Policy, Spina Bifida does not include spina bifida occulta.

**Spouse** means any individual who, under applicable state law, is recognized as the spouse of an Employee.

**Stroke** means a condition Diagnosed as a cerebrovascular accident including infarction of brain tissue, cerebral and subarachoid hemorrhage, cerebral embolism and cerebral thrombosis.

The diagnosis must be supported by:
1) evidence of persistent neurological deficits confirmed by a neurologist at least 30 days after the event; and
2) confirmatory neuroimaging studies consistent with the diagnosis of a new Stroke.

Stroke does not mean a head injury, transient ischemic attack (TIA), or chronic cerebrovascular insufficiency.

Stroke does not include a Diagnosis of Stroke for:
1) cerebral symptoms due to migraine;
2) cerebral injury resulting from trauma or hypoxia; or
3) vascular disease affecting the eye or optic nerve or vestibular functions.

In the event of death, an autopsy confirmation and/or death certificate identifying Stroke as the cause of death will be accepted.

**We, Us, Our** means Anthem Insurance Companies, Inc.

**You, Yours** means an Employee who is currently insured under the Policy and this Certificate. (See also Primary Insured.) This definition also includes a Spouse or Partner who has elected to continue coverage under the Extended Continuation provision.

## ELIGIBILITY & EFFECTIVE DATES

**Eligibility for Coverage**
An Employee will become eligible for coverage under the Policy on the latest of:
1) the Policy Effective Date; or
2) the date he/she becomes a member of an Eligible Class

A Dependent will become eligible for coverage under the Policy on the later of:
1) the date the Employee becomes insured under the Policy; or
2) the date You acquire the Dependent.

If more than one person within an immediate family unit is eligible for coverage under the Policy as an Employee of the Policyholder, then:
1) neither Employee may be covered as a Dependent of the other person; and
2) Dependent Child(ren) may only be covered as a Dependent of one Employee.

The date on which an Employee or Dependent becomes eligible for coverage may not be the same date on which insurance begins. The Coverage Effective Date provision describes the date on which insurance begins.

**Initial Enrollment**
An Employee must enroll for coverage for the Employee and any Dependent(s) within 31 days following the day the Employee or Dependent(s) first become(s) eligible for coverage under the Policy.

If an Employee does not enroll for coverage and/or Dependent's coverage during the Employee's or Dependent's initial enrollment period and later chooses to enroll, the Employee may only enroll for coverage and/or Dependent's coverage:
1) during an Annual Enrollment Period or any Additional Enrollment Event designated by the Policyholder; or
2) within 31 days of the date the Employee has a Change in Family Status.

**Coverage Effective Date**
Coverage will start on the latest to occur of:
1) the date an Employee or Dependent becomes eligible as described in the Eligibility for Coverage provision, if enrolled on or before that date;
2) the Policy Anniversary following the last day of an Annual Enrollment Period, if an Employee or Dependent is enrolled during an Annual Enrollment Period;
3) the first day of the month following the last day of an Additional Enrollment Event, if an Employee or Dependent is enrolled during an Additional Enrollment Event; or
4) the date an Employee or Dependent is enrolled.

In no event will Dependent insurance become effective before an Employee becomes insured.

The Coverage Effective Date for any Employee or Dependent is subject to the Deferred Coverage Effective Date provision.

**Deferred Coverage Effective Date**
All Coverage Effective Dates and Changes in Coverage effective dates for an Employee will be deferred if an Employee is not Actively at Work on the day coverage would otherwise begin. If deferred, coverage will become effective on the day after the date the Employee has completed one full day of Active Work.

In no event will Dependent insurance become effective before an Employee becomes insured.

This provision does not apply to Employees who are currently eligible for coverage under the Continuity from a Prior Policy provision.

**Continuity from a Prior Policy**
Coverage under the Policy will begin and will not be deferred if, on the day before the Policy Effective Date, an Employee:
1) was insured under a Prior Policy; and
2) is otherwise eligible under the Policy but is not Actively at Work on the Policy Effective Date and:
   a. is on a leave of absence protected under:
      i. the federal Family and Medical Leave Act (FMLA) or Uniformed Services Employment and Reemployment Rights Act (USERRA); or
      ii. any other applicable federal or state law that allows for continuation of insurance in certain instances; or
   b. was eligible for and insured under a continuation provision of a Prior Policy on the day before the Policy Effective Date; provided the Employee is not insured under any continuation, portability or conversion provision of a Prior Policy after the Policy Effective Date.

If coverage is continued for an Employee under this provision, coverage may also be continued for any eligible Dependent(s) who were insured under the Prior Policy. Insurance under this provision is subject to uninterrupted payment of premium to Us when due.

Coverage provided through this provision ends on the first to occur of:
1) the last day of the 12th month on or next following the Policy Effective Date;
2) the last day the Employee would have been covered under the Prior Policy, had the Prior Policy not terminated;
3) the last day of the continuation period allowed by FMLA, USERRA or applicable federal or state law;
4) the date insurance terminates for any reason shown under the Termination of Coverage provision; or
5) the date the Employee resumes Active Work for the Policyholder or begins full-time employment with any other employer.

If an Employee is eligible for insurance under this provision, the Employee is not eligible for insurance under any Continuation provision of this Certificate. Except as stated in this provision, coverage under this provision is subject to all other terms and provisions of the Policy.

**Changes in Coverage**
An Employee may elect, drop, increase, decrease or otherwise change coverage only:
1) during an Annual Enrollment Period or any Additional Enrollment Event; or
2) within 31 days of a Change in Family Status.

Any change in coverage requested by an Employee will become effective on:
1) the Policy Anniversary following the last day of an Annual Enrollment Period, if the change is requested during such period;
2) the first day of the month following the last day of an Additional Enrollment Event, if the change is requested during such event; or
3) the first day of the month following the date on which the change is requested following a Change in Family Status; subject to the Deferred Effective Date.

Any change in coverage requested by the Policyholder or as a result of a change in the terms of the Policy will become effective on the first day of the month following the date of the request or change.

## TERMINATION OF COVERAGE

**Termination of Coverage**
Coverage for You and any Dependent(s) will end on the earliest of the following:
1) the last day of the month following the date You become no longer eligible for insurance under any provision of the Policy;
2) the last day of the month following the date You attain age 85;
3) the last day of the month following the date You are no longer in an Eligible Class or the Policy no longer covers Your class;
4) the date You request We terminate coverage, subject to the Changes in Coverage provision;
5) the last day of the month following the date the required premium is due but not paid, or
6) the date the Policy terminates.

Coverage for a Dependent will also end on the last day of the month following the date a Dependent no longer satisfies the definition of Spouse or Partner or Dependent Child(ren), except for a Dependent Child that reaches the limiting age. Coverage for a Dependent Child that reaches the limiting age will end the last day of the month during which the child attains the limiting age.

When coverage would otherwise end, You or an insured Spouse or Partner, in certain circumstances may be able to continue insurance for You and any Dependent Child(ren):
1) under a Continuation provision; or
2) under the Extended Continuation provision.

Termination of coverage has no effect on benefits payable for Treatment that is received for a Critical Illness or other loss Diagnosed while a Covered Person was insured under the Policy.

CONTINUATION

## CONTINUATION

**Continuation**
You may be able to continue coverage for You and any Dependent(s) in certain circumstances when You are no longer Actively at Work. The Continuation Options are explained below.

Any coverage continued under this provision through any of the Continuation Option(s) is subject to the following conditions:

1) We must continue to receive premium payment when due (premiums must be paid by You or paid on Your behalf);
2) the Policyholder must approve the continuation; and
3) if You are eligible for more than one Continuation Option:
    a. the continuation time periods will not be applied consecutively; and
    b. the longest applicable continuation time period from the date You were last Actively at Work will apply.

Coverage continued under this provision will end on the last day of the month on or next following the earliest of the day:

1) the applicable continuation time period has expired, as described in the Continuation Options;
2) You return to Active Work for the Policyholder; or
3) You begin full-time employment with an employer other than the Policyholder.

Coverage continued under this provision will also end in accordance with the Termination of Coverage provision. Except as described in this provision, coverage continued under this provision is subject to all other terms and provisions of the Policy.

**Continuation Option(s)**
**Leave of Absence:** If You are on a leave of absence approved by the Policyholder due to any personal reason, coverage may be continued for up to 12 weeks from the date You ceased Active Work.

**Federal and/or State Laws:** The federal Family and Medical Leave Act (FMLA) and Uniformed Services Employment and Reemployment Rights Act (USERRA) and any amendments thereto, as well as other applicable federal or state laws, may allow continuation of insurance in certain circumstances for medical leaves of absence, military leaves of absence, other leaves of absence, layoff or termination of employment.

If You are not Actively at Work and are eligible to continue insurance under one of these laws, coverage may be continued for up to the time period allowed by the law that enables the continuation. Contact the Policyholder for additional information regarding continuation options that may be available through federal and/or state laws.

**Illness or Injury:** If You are not Actively at Work due to Illness or Injury, coverage may be continued for up to 12 weeks from the date You ceased Active Work.

**Temporary Layoff:** If You are subject to a temporary involuntary layoff by the Policyholder, coverage may be continued for up to 12 weeks from the date You ceased Active Work. If the layoff becomes permanent, this continuation will cease immediately.

**Furlough:** If You are subject to a temporary work furlough by the Policyholder, coverage may be continued for up to 12 weeks from the date You ceased Active Work. If the furlough ends or becomes permanent (employment is terminated), this continuation will cease immediately.

## EXTENDED CONTINUATION

**Extended Continuation**
You or an insured Spouse or Partner, in certain circumstances, may continue coverage under the Policy when insurance would otherwise end under the Termination of Coverage provision.

If You are age 84 or younger, You may be able to continue coverage for You and any insured Dependent(s) under this provision when You:
1) are no longer Actively at Work and are not eligible for coverage under any other Continuation provision in this Certificate; or
2) are no longer employed by the Policyholder, including retirement.

If You are eligible to continue coverage under this provision, then You must elect insurance under this provision in order for any Dependent(s) to remain eligible for coverage.

An insured Spouse or Partner who is age 84 or younger may be able to continue coverage under this provision for him/herself and any insured Dependent Child(ren):
1) in the event of Your death; or
2) in the event of divorce, dissolution of partnership or legal separation from You.
3) when You enter active duty service or training in any military for a period of 31 days or more and are no longer eligible under the Policy as an Employee.

If an insured Spouse or Partner continues coverage under this provision, the Spouse or Partner will become a Primary Insured going forward. Any Dependent Child(ren) may be covered under the Employee, or the Spouse or Partner, but not both.

**Requesting Extended Continuation**
When coverage under the Policy would otherwise end, notice of the right to continue coverage under this provision will be given. To elect Extended Continuation, You or Your insured Spouse or Partner must send a request to Us.

The request and the initial premium due must be received within 31 days after insurance under the Policy would otherwise end. If timely notice is not given, an extension of the period of time in which to request continued coverage under this provision will be allowed. You or Your Spouse or Partner will have 15 days from the date notice is received to submit the request and initial premium. However, in no event will a request be accepted by Us if received more than 91 days after the date coverage under the Policy would otherwise end, even if notice is not received.

Coverage continued under this provision:

1) will become effective on the first day of the month following the date coverage under the Policy would otherwise end, so that there is no interruption in coverage; and
2) is subject to continued payment of premium as due, including any portion of the premium that was previously paid for by the Policyholder.

Coverage continued under this provision will end on the last day of the month during which You resume Active Work for the Policyholder.

Coverage continued under this provision will also end in accordance with the Termination of Coverage provision. Except as described in this provision, coverage continued under this provision is subject to all other terms and provisions of the Policy.

## CRITICAL ILLNESS BENEFITS

**Critical Illness Benefit:**
If a Covered Person is Diagnosed with a Critical Illness, while covered under the Policy, We will pay a Critical Illness Benefit. The Critical Illness Benefit is equal to the Coverage Amount multiplied by the Percentage of Coverage Amount for the Critical Illness, as shown in the Benefit Schedule for each Covered Person.

Subject to the Coverage Maximums shown in the Benefit Schedule:
1) Cancer Benefits shown in the Benefit Schedule will only be paid once per Critical Illness for each Covered Person, unless a Recurrence Benefit is available. Following payment of a Cancer Benefit or a Cancer Recurrence Benefit, a period of 30 days must be satisfied before payment of any other Cancer Benefit;
2) Vascular Benefits shown in the Benefit Schedule will only be paid once per Critical Illness for each Covered Person, unless a Recurrence Benefit is available. Following payment of a Vascular Benefit or a Vascular Recurrence Benefit, a period of 30 days must be satisfied before payment of any other Vascular Benefit; and
3) with the exception of Vascular and Cancer Benefits, there is no period of time to be satisfied before payment of any other Critical Illness Benefit.

**Recurrence Benefit:**
We will pay a Recurrence Benefit as shown in the Benefit Schedule if a Covered Person receives a Diagnosis of a recurrence of a Critical Illness previously paid under the Policy.

Subject to the Coverage Maximums shown in the Benefit Schedule:
1) the condition must be listed as a Recurrence Benefit in the Benefit Schedule; and
2) the Diagnosis of recurrence must be made 6 months or more following the initial Critical Illness Diagnosis.

We will not pay more than one Recurrence Benefit per Critical Illness for the Covered Person during the Covered Person’s lifetime.

**Skin Cancer Benefit:**
We will pay the Skin Cancer Benefit Coverage Amount if the Covered Person is Diagnosed with Skin Cancer.

The Skin Cancer Benefit is payable once per each Covered Person’s lifetime.

**Health Screening Benefit:**
For each day a Covered Person has one or more of the screening tests for Critical Illness listed below, not to exceed one day per calendar year, We will pay the Health Screening Benefit stated in the Schedule. The amount stated is the total amount payable in any calendar year regardless of the number of tests or days of tests during that calendar year. A screening test includes any of the following:

1) abdominal aortic aneurysm ultrasound;
2) blood test for triglycerides;
3) bone marrow testing;
4) bone density screening;
5) breast ultrasound;
6) CA 15-3 (blood test for breast cancer);
7) CA 125 (blood test for ovarian cancer);
8) carotid ultrasound;
9) CEA (blood test for colon cancer);
10) cervical cancer screening;
11) chest x-ray;
12) colonoscopy;
13) CT angiography;
14) ECG/EKG;
15) double contrast barium enema;
16) fasting blood glucose test;
17) flexible sigmoidoscopy;
18) hemoccult stool analysis;
19) lipid panel;
20) mammography;
21) pap smear;
22) PAD ultrasound
23) PSA (blood test for prostate cancer);
24) serum cholesterol test (for HDL and LDL levels);
25) SPEP (blood test for myeloma);
26) stress test (on a bicycle or treadmill);
27) thermography; or
28) any other generally medically accepted cancer-screening test.

We will pay:

1) regardless of the result of any test; and
2) provided the test was conducted while the Covered Person was covered under the Policy.

**EXCLUSIONS**

**Exclusions:**
No benefits are payable under this Certificate for Critical Illness that results from or is caused by:

1) suicide, attempted suicide or intentionally self-inflicted injury, whether sane or insane;
2) war or act of war, declared or undeclared;
3) the Covered Person's participation in a felony, riot or insurrection;
4) the Covered Person's engaging in any illegal occupation; or
5) the Covered Person's service in the armed forces or units auxiliary to them.

## CLAIM PROVISIONS

### Notice of Claim

Notice of claim may be given to Anthem Insurance Companies, Inc., 220 Virginia Avenue, Indianapolis, IN 46204, within 20 days after the start of any loss covered by the Policy, or as soon as reasonably possible. Notice given by or on behalf of a Covered Person to Us, or to Our authorized agent, with information sufficient to identify the Covered Person, shall be notice to Us.

Failure to give notice within this time frame will not invalidate nor reduce any claim.

### Claim Forms

When We receive Notice of Claim, We will send claim forms. If the claimant does not receive the forms within 10 working days after Notice of Claim is sent, Proof of Loss may be sent to Us without waiting to receive the claim forms.

### Proof of Loss

The claimant must send proof of loss to Us. This proof must be provided within 90 days after the date of the loss. If it is not reasonably possible to give proof in this time, proof must be provided as soon as reasonably possible. Proof of loss may not be given more than one year after the time proof is otherwise required, unless the claimant is legally incapacitated.

### Physical Examinations and Autopsy

We, at our own expense, shall have the right and opportunity to have:

1) a Covered Person for whom a claim is made examined by a Physician or Medical Professional of Our choice during the pendency of a claim as often as reasonably required; and
2) an autopsy conducted for a Covered Person for whom a claim is made in case of death, where not prohibited by law.

### Time of Payment of Claims

Benefits payable under the Policy will be paid within 15 working days for electronic claims, or 30 calendar days for paper claims, after Our receipt of due Proof of Loss.

### Payment of Claims

All benefits are payable to You. Any benefits unpaid at the time of Your death will be paid to:

1) Your designated beneficiary(ies); or if none, then to
2) Your estate.

### Beneficiary Designation

In the event of Your death, You should designate one or more beneficiaries to receive any benefits under the Policy that are unpaid at the time of Your death. Beneficiary records will be kept by the Policyholder, plan administrator or the office/system where beneficiary records for the Policy are kept. The most current beneficiary designation in effect under a Prior Policy will be accepted as a beneficiary designation under the Policy until changed (if applicable).

Certain states are community property states. If You live in a community property state and designate someone other than Your Spouse or Partner as a beneficiary, state law may require that Your Spouse or Partner consent to such designation. If spousal consent to the designation is not obtained, then such designation may not be effective. Community property states as of the Policy Effective Date include: Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin.

### Change of Beneficiary

The beneficiary may be changed at any time by You or Your assignee (if You assigned this insurance). To make a change, a request should be provided to the Policyholder, plan administrator or to the office/system where beneficiary records for the Policy are kept. If it is not known where the records are kept, then the request may be provided to Us. When received by the Policyholder, plan administrator, office/system where beneficiary records for the Policy are kept or Us, the change will take effect as of the

date the request is signed. The change will not apply to any payments or other action taken by Us before the request was received.

The right to change of beneficiary is reserved to You, and the consent of the beneficiary or beneficiaries shall not be requisite to any change in beneficiary, unless the current beneficiary designation is irrevocable.

**Claim Denial**
If a claim for benefits is wholly or partly denied, the claimant will be furnished with written notification of the decision. This written notification will:

1) give the specific reason(s) for the denial;
2) make specific reference to the Policy provisions on which the denial is based;
3) provide a description of any additional information necessary to perfect a claim and an explanation of why it is necessary; and
4) provide an explanation of the review procedure.

**Claim Appeal**
On any claim, the claimant or his or her representative may appeal to Us for a full and fair review. To do so, the claimant:

1) must submit a written request for review within:
   a) 180 days of receipt of Claim Denial if the claim requires Us to make a determination of a Critical Illness or other loss; or
   b) 60 days of receipt of Claim Denial if the claim does not require Us to make a determination of a Critical Illness or other loss; and
2) may request copies of all documents, records, and other information relevant to the claim; and
3) may submit written comments, documents, records and other information relating to the claim.

We will respond in writing with Our final decision on the claim.

**Overpayment Recovery**
We have the right to recover from You or the recipient of benefits any amount that We determine to be an overpayment. You or the recipient of benefits has the obligation to refund to Us any such amount.

If benefits are overpaid on any claim, You or the recipient of benefits must reimburse Us within 90 days.

If reimbursement is not made in a timely manner, We have the right to:

1) recover such overpayments from:
   a) You;
   b) any other person to or for whom payment was made; or
   c) Your estate;
2) reduce or offset against any future benefits payable to You or Your survivors until full reimbursement is made;
3) refer the unpaid balance to a collection agency; and
4) pursue and enforce all legal and equitable rights in court.

## GENERAL PROVISIONS

**Entire Contract**
The Policy, the Policyholder's signed application, this Certificate and any riders, endorsements or other attached papers make up the entire contract of insurance between the Policyholder and Us.

**Statements**
All statements made by the Policyholder or any Covered Person are considered representations and not warranties. No statement made by a Covered Person will be used to deny a claim or rescind coverage unless a copy of the statement is furnished to the Covered Person, his or her beneficiary or personal representative.

**Time Limit on Certain Defenses**
Absent a showing of intentional fraud, no statement concerning insurability made by any Covered Person shall be used to contest the validity of the insurance for which the statement was made after this Policy has been in force for two years. In order to be used, the statement must be in writing and signed by the person making the statement. However, We are not precluded at any time from asserting defenses based upon the person's ineligibility for coverage under this Policy, or upon other provisions in the Policy.

**Legal Actions**
No legal action may start:
1) until 60 days after Proof of Loss has been given;
2) more than 3 years after the time proof of loss is required to be given; unless otherwise required by law in Your or the claimant's jurisdiction of residence.

**Misstatement of Age or Tobacco Class**
If the age or tobacco class of any Covered Person has been misstated:
1) the premium may be adjusted; and
2) the true facts will be used to determine if, and for what amount, coverage should have been in force.

**Assignment**
You have the right to absolutely assign Your rights and interest under the Policy including, but not limited to, the following:
1) the right to make any contributions required to keep the insurance in force; and
2) the right to name and change a beneficiary.

We will recognize any absolute assignment made by You under the Policy, provided:
1) it is duly executed; and
2) a copy is acknowledged and on file with Us.

We and the Policyholder assume no responsibility:
1) for the validity or effect of any assignment; or
2) to provide any assignee with notices which We may be obligated to provide to You.

You do not have the right to collaterally assign his/her rights and interest under the Policy.

**Insurance Fraud**
Insurance fraud occurs when any person and/or the Policyholder provide Us with false information or file a claim for benefits that contains any false, incomplete or misleading information with the intent to injure, defraud or deceive Us. It is a crime if a person and/or the Policyholder commit insurance fraud. We will use all means available to Us to detect, investigate, deter and prosecute those who commit insurance fraud. We will pursue all available legal remedies if a person and/or the Policyholder perpetrate insurance fraud.

**Conformity with State and Federal Laws**
Any provision of the Policy that is contrary to the law of the jurisdiction in which it is delivered or with any other applicable law is amended to meet the minimum requirements of the law.

**Time Periods**
Unless otherwise specifically stated, all time periods begin and end at 12:01 A.M., Standard Time at the place where the Policy is delivered.

**Workers' Compensation**
The Policy does not replace Workers' Compensation or affect any requirement for Workers' Compensation coverage.

**Unpaid Premium**
Upon the payment of a claim, any premium then due and unpaid may be deducted from the claim payment.

**Policy Interpretation**
We have discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I. CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT,
IN AND FOR ST. JOHNS COUNTY, FLORIDA

A. L.
Plaintiff

Case # 552026CC005992A000MX
Judge ____________

vs.
ANTHEM INSURANCE COMPANIES, INC.
Defendant

---

**II. AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☒ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☐ over $100,000.00

**III. TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.



Accepted 10/20/2026 08:59 AM by the Clerk of the Circuit Court, St. Johns County, Florida, DIN: 4

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
- ☐ Business governance
- ☐ Business torts
- ☐ Environmental/Toxic tort
- ☐ Third party indemnification
- ☐ Construction defect
- ☐ Mass tort
- ☐ Negligent security
- ☐ Nursing home negligence
- ☐ Premises liability—commercial
- ☐ Premises liability—residential

☐ Products liability
☐ Real Property/Mortgage foreclosure
- ☐ Commercial foreclosure
- ☐ Homestead residential foreclosure
- ☐ Non-homestead residential foreclosure
- ☐ Other real property actions

☐Professional malpractice
- ☐ Malpractice—business
- ☐ Malpractice—medical
- ☐ Malpractice—other professional

☐ Other
- ☐ Antitrust/Trade regulation
- ☐ Business transactions
- ☐ Constitutional challenge—statute or ordinance
- ☐ Constitutional challenge—proposed amendment
- ☐ Corporate trusts
- ☐ Discrimination—employment or other
- ☐ Insurance claims
- ☐ Intellectual property
- ☐ Libel/Slander
- ☐ Shareholder derivative action
- ☐ Securities litigation
- ☐ Trade secrets
- ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☒ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**IV. REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V. NUMBER OF CAUSES OF ACTION: [ ]**
(Specify)

1

**VI. IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ yes
☒ no

**VII. HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ no
☐ yes If "yes," list all related cases by name, case number, and court.

**VIII. IS JURY TRIAL DEMANDED IN COMPLAINT?**
☒ yes
☐ no

**IX. DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
☐ yes
☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Maria T. Santi — Attorney or party    Fla. Bar # 117564 — (Bar # if attorney)

Maria T. Santi — (type or print name)    10/16/2026 — Date

IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

A.L., Case No.: CC26-5992

Plaintiff,

v.

ANTHEM INSURANCE COMPANIES, INC.,

Defendant.
_______________________________________/

**SUMMONS SERVICE ON A CORPORATION**
**IMPORTANT**

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Request for Admission, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**ANTHEM INSURANCE COMPANIES, INC.**
**C T CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**Health and Medicine Law Firm PLLC**
*Counsel for Plaintiff*
8925 SW 148 Street, Suite 216
Miami, FL 33176
Ph: 305-677-2296
Fax: 305-677-2306

Service email:
admin@healthandmedicinelawfirm.com
Attorney emails:
msanti@healthandmedicinelawfirm.com

DATED ON OCTOBER 20TH 2026.

Brandon J. Patty
CLERK OF THE CIRCUIT COURT

(SEAL)

By: Megan Barele
Deputy Clerk

# St. Johns County Receipt of Transaction

## Receipt # 2026044831

Brandon J. Patty
St. Johns County Clerk of the Circuit Court and Comptroller
4010 Lewis Speedway, St. Augustine, FL 32084
904-819-3600

SANTI, MARIA T
8925 SW 148TH STREET
SUITE 216
MIAMI, FL 33176

Cashiered by: djarrard
On: 10/20/2026 9:34 am
Transaction # 1252664

**CASE NUMBER CC26-5992**

**A. L. *VS* ANTHEM INSURANCE COMPANIES, INC.**

| Fee Description | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|
| (S201A) NON-FORECLOSURE $15,00 | 400.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 |
| (S28) SP/CC SUMMONS | 10.00 | 0.00 | 0.00 | 10.00 | 10.00 | 0.00 |
| **Total** | **410.00** | **0.00** | **0.00** | **410.00** | **410.00** | **0.00** |
| **Grand Total** | **410.00** | **0.00** | **0.00** | **410.00** | **410.00** | **0.00** |

**PAYMENTS**

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| ACH - CIVIL | 20869894 | OK | 410.00 | 0.00 | 0.00 | 0.00 | 410.00 |
| | | | **410.00** | **0.00** | **0.00** | **0.00** | **410.00** |

**We Want to Hear From You!**

Scan this QR Code or
visit stjohnsclerk.com/cc
to give feedback.

**IN THE CIRCUIT/COUNTY COURT OF FLORIDA, SEVENTH JUDICIAL CIRCUIT, IN AND FOR FLAGLER, PUTNAM, ST. JOHNS AND VOLUSIA COUNTIES**

# UNIFORM CASE MANAGEMENT ORDER

**NOTICE: The deadlines referenced in this Order will be strictly enforced.**

This Case Management Order is issued in accordance with Fla. R. Civ. P. 1.200 and Administrative Order(s) of the Seventh Judicial Circuit Court. The deadlines referenced herein apply in conjunction with the trial date specified in the Order Setting Trial.

## A. CASE DESIGNATION

All civil cases will be assigned a designation as follows: Civil cases in which trials by jury are demanded are designated as "General," except those cases in which all defendants have been defaulted. Civil cases designated as "Complex" pursuant to Rule 1.201, Fla. R. Civ. P., are exempted from the requirements of this Order and will follow the procedures outlined in the Rule. All other civil cases are designated as "Streamlined." Parties may move for redesignation in accordance with Fla. R. Civ. P. 1.200 (c)(1). Civil actions specified in Fla. R. Civ. P. 1.200(a)(1-18) are likewise exempted from the requirements of this order.

## B. PROJECTED TRIAL PERIOD

The projected trial period for "General" cases will be no later than eighteen (18) months from case filing. The projected trial period for "Streamlined" cases will be no later than twelve (12) months from case filing. The parties may move the Court to fix a trial period on or before the projected trial period. For cases in which no trial order has been issued, the parties seeking affirmative relief must notify the Court no later than seventy-five (75) days before the expiration of the projected trial period that no trial order has been issued.

## C. SERVICE OF PROCESS

Plaintiff(s) are required to serve each defendant with initial process and pleading no later than one hundred twenty (120) days from case filing as provided in Fla. R. Civ. P. 1.070(j). Proof of service of process is to be promptly filed with the Clerk of Court. Motions for extension of time to complete service of process must be filed no later than ten (10) days prior to the expiration of the initial time allotted for service. The motions must specify the reasons why service could not be performed within 120 days and what attempts had been made at service during that period. In its discretion, the presiding judge may grant the plaintiff(s) an additional ninety (90) days to serve any remaining defendant(s). After the expiration of the time for service, including any extensions, any unserved defendant(s) may be dismissed from the action without further notice.

## D. ADDING NEW PARTIES

The deadline for adding new parties to an action is 120 days after the completion of service of process on the initial defendants in cases designated as "General" and 90 days after the completion of service of process on the initial defendants in cases designated as "Streamlined." Parties may not be added to actions after these deadlines absent a showing of good cause.

## E. OBJECTIONS TO PLEADINGS

Motions objecting to pleadings must be called up for hearing no later than 120 days after the filing of the motion. Motions objecting to pleadings not called up for hearing within the time specified herein, absent a showing of good cause, may be deemed waived or abandoned.

## F. DISCOVERY/DISCLOSURE DEADLINES

All discovery is to be completed according to the following schedule:

| Action or Event | General | Streamlined |
|---|---|---|
| Mandatory Initial Disclosures | As provided in Fla. R. Civ. P. 1.280(a) | As provided in Fla. R. Civ. P. 1.280(a) |
| Disclosure of expert witnesses | 120 days before docket sounding for parties seeking affirmative relief; 90 days before docket sounding for parties not seeking affirmative relief | 90 days before docket sounding for parties seeking affirmative relief; 60 days before docket sounding for parties not seeking affirmative relief |
| Disclosure of fact witnesses | 60 days before docket sounding | 60 days before docket sounding |
| Service of written discovery requests | 45 days before docket sounding | 45 days before docket sounding |
| Completion of all discovery | 10 days before docket sounding | 10 days before docket sounding |

## G. DISPOSITIVE MOTIONS

Dispositive motions must be filed and served no later than 120 days prior to the scheduled or projected trial period for "General" cases and 90 days prior to the scheduled or projected trial period for "Streamlined." cases. Motions for summary judgment and responses in opposition must comply with the deadlines set forth in Fla. R. Civ. P. 1.510. Movants must promptly call up dispositive motions for hearing, but no sooner than the time specified in Rule 1.510. Replies to responses in opposition to dispositive motions are only permitted upon leave of Court.

## H. EXPERT WITNESS MOTIONS

Expert witness-related motions or objections (e.g., *Daubert* motions) must be filed no later than 60 days prior to the start of the scheduled or projected trial period for "General" cases and forty-five (45) days prior to the start of the specified or projected trial period for "Streamlined" cases.

## I. PRETRIAL MOTIONS

All pretrial motions, other than dispositive motions and motions directed at expert witnesses, must be filed no later than thirty (30) days prior to the trial date. Pretrial motions filed within 30 days of trial will not be considered if predicated on matters the movant knew or should have known with the exercise of reasonable diligence at least 30 days prior to the trial date. Compliance by counsel (not staff) with the conferral requirements in Fla. R. Civ. P. 1.202 is required. Failure to comply with conferral requirements may result in summary denial of motions. Because of busy court calendars, hearing time may not be available to consider motions filed close to the deadline. The inability of a party to obtain hearing time will generally not constitute grounds for a continuance of the trial.

## J. MEDIATION

Unless excused by the Court or excluded pursuant to Fla. R. Civ. P. 1.710(b), mediation is to be conducted in all cases. Mediation must be concluded, and a report filed prior to docket sounding.

## K. EXTENSIONS/MODIFICATIONS OF DEADLINES

The deadlines specified herein will be strictly enforced unless modified by Court order. The parties may submit an agreed order to extend disclosure and/or discovery deadlines; however, all remaining deadlines will remain in place absent a Court order. Continuances of deadlines are strongly discouraged.

## L. SERVICE OF THIS ORDER

Plaintiff is required to serve a copy of this Order on all other parties and file a notice of service with the Clerk within 30 days of the date of its issuance.

**DONE AND ORDERED** in Flagler, Putnam, St. Johns, and Volusia counties.

**Leah R. Case**
**Chief Judge**

Effective: January 1, 2025
Adopted: December 2024

Filing # 259706212 E-Filed 10/21/2026 01:56:44 PM

A.L.

PLAINTIFF(S)

VS.

ANTHEM INSURANCE COMPANIES, INC.

DEFENDANT(S)

SUMMONS, COMPLAINT, UNIFORM CASE MANAGEMENT ORDER

**CASE #:** **CC26-5992**
**COURT:** **7TH JUDICIAL CIRCUIT**
**COUNTY:** **ST. JOHNS**
**DFS-SOP #:** **26-000196445**

# NOTICE OF SERVICE OF PROCESS

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the of the State of Florida's Department of Financial Services. Said process was received by ELECTRONIC DELIVERY on Tuesday, October 20, 2026 and a copy was forwarded by ELECTRONIC DELIVERY on Wednesday, October 21, 2026 to the designated agent for the named entity as shown below.

ANTHEM INSURANCE COMPANIES, INC.
DONNA MOCH
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324

***Our office will only serve the initial process (Summons and Complaint) or Subpoena and is not responsible for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court pursuant to Florida Rules of Civil Procedure, Rule 1.080.**

MARIA T SANTI
ATTORNEY
HEALTH AND MEDICINE LAW FIRM
8950 SW 74TH CT STE 2201
MIAMI, FL 33156

AC2


**Accepted 10/23/2026 02:49 PM by the Clerk of the Circuit Court, St. Johns County, Florida, DIN: 10**

IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

A.L.,

Plaintiff,

v.

ANTHEM INSURANCE COMPANIES, INC.,

Defendant.

_____________________________________________/

**COMPLAINT FOR DECLARATORY JUDGMENT FOR RECOVERY OF CONTRACTUAL INSURANCE BENEFITS PURSUANT TO ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**

Plaintiff, A.L. ("Plaintiff"), by and through undersigned counsel, files this Complaint against Defendant, ANTHEM INSURANCE COMPANIES, INC. ("Anthem" or "Defendant"), and alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action to recover benefits allegedly due under an employer-sponsored supplemental Critical Illness Insurance Policy issued by Defendant, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

2. Plaintiff purchased and maintained critical illness insurance coverage providing a $30,000 benefit for qualifying Invasive Cancer and a $7,500 benefit for qualifying Non-Invasive Cancer.

3. Plaintiff was diagnosed with breast cancer on February 13, 2025. The diagnosis was subsequently confirmed by pathological examination to include Grade 2 invasive ductal carcinoma, as well as a separate invasive lobular carcinoma component.

4. Plaintiff's treating breast surgical oncologist confirmed the invasive nature of Plaintiff's malignancies through medical documentation, surgical pathology, and written correspondence submitted to Defendant.

5. Despite these findings, Defendant classified Plaintiff's cancer under the Policy's Non-Invasive Cancer benefit, paying only $7,500 and refusing to pay the remaining $22,500 sought by Plaintiff.

6. Defendant based its determination principally upon Plaintiff's Stage IA cancer classification, notwithstanding the Policy's separate description of Invasive Cancer as a malignancy involving invasion of normal tissue.

7. Plaintiff disputes Defendant's interpretation and application of the Policy and contends that the denial improperly fails to reconcile the Policy's tissue-invasion language, its cancer-staging provisions, and the objective pathological evidence.

8. Plaintiff exhausted the administrative appeals process. Defendant issued its final adverse benefit determination on February 20, 2026.

9. Plaintiff brings this action under 29 U.S.C. § 1132(a)(1)(B) to recover benefits allegedly due under the Policy, together with prejudgment interest, reasonable attorney's fees, costs, and other appropriate relief.

## II. PARTIES

10. Plaintiff, A.L., is a resident of St. Johns County, Florida, and was at all material times an insured participant or beneficiary under the Critical Illness Insurance Plan at issue.

11. Defendant, Anthem Insurance Companies, Inc., is an insurance company whose principal office is identified in the Certificate of Coverage as 220 Virginia Avenue, Indianapolis, Indiana 46204.

12. Defendant issued Group Critical Illness Insurance Policy No. 270017 to Intercontinental Exchange, Inc., the employer and policyholder, A.L. who resides in Jacksonville.

13. At all material times, Defendant was responsible for determining eligibility for benefits, interpreting the applicable insurance provisions, and paying benefits under the Policy.

14. Defendant made the adverse benefit determination challenged in this action and upheld that determination following Plaintiff's administrative appeal.

## III. JURISDICTION AND VENUE

15. This is an action for recovery of $22,500 in unpaid contractual insurance benefits, exclusive of interest, attorney's fees, and costs.

16. This Court has subject-matter jurisdiction pursuant to section 34.01, Florida Statutes, because the amount in controversy does not exceed $50,000, exclusive of interest, costs, and attorney's fees.

17. This Court also has concurrent subject-matter jurisdiction over Plaintiff's claim for benefits pursuant to 29 U.S.C. § 1132(e)(1), which permits actions brought under 29 U.S.C. § 1132(a)(1)(B) to be maintained in a state court of competent jurisdiction.

18. Plaintiff is a participant or beneficiary of an employee welfare benefit plan governed by ERISA and seeks to recover benefits due under the terms of that Plan.

19. Venue is proper in St. Johns County, Florida, pursuant to section 47.051, Florida Statutes, because, upon information and belief, Defendant is a foreign corporation doing business

in Florida and the contractual obligation to pay insurance benefits to Plaintiff was to be performed in St. Johns County, where Plaintiff resides.

20. Alternatively, venue is proper to the extent that the cause of action accrued in St. Johns County through Defendant's failure to pay benefits allegedly due to Plaintiff in that County.

21. Plaintiff has exhausted the applicable administrative remedies, and Defendant issued its final adverse benefit determination on February 20, 2026.

22. Plaintiff is entitled to seek judicial enforcement of her rights and recovery of benefits under the governing insurance Plan.

## IV. THE INSURANCE CONTRACT AND COVERAGE

19. Defendant issued Group Critical Illness Insurance Policy No. 270017 to Intercontinental Exchange, Inc., with an identified effective date of January 1, 2022. *See* Exh. A.

20. The Certificate of Coverage identifies Plaintiff's applicable benefit class as Class 02, covering eligible employees electing the $30,000 benefit.

21. The Policy provides voluntary supplemental insurance benefits upon the diagnosis of specified critical illnesses.

22. The Certificate identifies a $30,000 Coverage Amount for a Primary Insured under Plaintiff's elected benefit class.

23. Under the Benefit Schedule, the Policy provides payment of 100% of the Coverage Amount for Invasive Cancer and 25% of the Coverage Amount for Non-Invasive Cancer.

24. Accordingly, the scheduled benefit for Invasive Cancer is $30,000, whereas the scheduled benefit for Non-Invasive Cancer is $7,500.

25. The Policy's Critical Illness Benefit provision states that, when a Covered Person is diagnosed with a Critical Illness while insured under the Policy, Defendant will pay the applicable benefit determined by multiplying the Coverage Amount by the percentage shown in the Benefit Schedule.

26. The Policy defines Invasive Cancer, in relevant part, by reference to a malignancy characterized by uncontrolled and abnormal malignant-cell growth and spread, with invasion of normal tissue, as diagnosed by an appropriately qualified physician.

27. The Policy further states that Invasive Cancer includes cancers classified as Stage 2 through Stage 4, or **their equivalent**.

28. The Policy also provides that Invasive Cancer does not include a condition considered Non-Invasive Cancer.

29. Separately, the Policy defines Non-Invasive Cancer to include Stage I cancer or its equivalent, as well as certain qualifying carcinoma-in-situ diagnoses.

30. Plaintiff acknowledges that the Policy's cancer classifications contain express staging provisions and that Defendant relied upon those provisions in denying the additional benefit.

31. Plaintiff contends, however, that the Policy must be interpreted as a whole, including the language describing invasive malignancy and the relationship between its medical and staging classifications.

32. Plaintiff further contends that the interaction between the Policy's tissue-invasion language and its classification of Stage I cancers presents an interpretive dispute that must be resolved under the applicable principles governing ERISA benefit claims.

33. Plaintiff was insured under the Policy at the time of the relevant cancer diagnosis, as reflected by Defendant's acceptance and partial payment of her claim.

## V. PLAINTIFF'S DIAGNOSIS OF INVASIVE BREAST CANCER

34. Plaintiff underwent breast imaging and diagnostic evaluation following the identification of suspicious abnormalities in her right breast.

35. Subsequent diagnostic testing identified a suspicious breast mass requiring additional pathological evaluation.

36. On February 13, 2025, a right breast ultrasound-guided core needle biopsy was performed.

37. The pathology established a diagnosis of invasive ductal carcinoma, Grade 2 under the Nottingham grading system.

38. The pathology further documented malignant tumor cells with invasive characteristics, distinguishing the invasive ductal carcinoma from noninvasive or in-situ breast abnormalities.

39. The initial core biopsy identified a 7-millimeter dimension of tumor within the sampled tissue.

40. Plaintiff subsequently underwent a central lumpectomy and sentinel lymph node biopsy on February 20, 2025.

41. The surgical pathology documented invasive breast carcinoma and an invasive tumor dimension of 17 millimeters and documented Grade 2 invasive ductal carcinoma.

42. Plaintiff's treating physician subsequently described the surgical findings as multifocal breast cancer, including a **1.4-centimeter invasive ductal carcinoma** and a separate 1.7-millimeter **invasive** lobular carcinoma.

43. These findings establish that Plaintiff's breast malignancy was not confined exclusively to carcinoma in situ.

44. The existence of separate invasive ductal and invasive lobular carcinoma components was medically significant and confirmed through pathological evaluation.

45. Plaintiff's Grade 2 designation refers to the histological grade of her breast carcinoma under the Nottingham grading system, whereas the Stage IA classification refers to the clinical or pathological extent of the malignancy. These classifications are medically distinct and are not interchangeable. Plaintiff's Stage IA designation does not negate the pathological confirmation that her breast cancer was invasive.

46. Plaintiff relies upon the pathological findings to establish the invasive nature of her malignancies and to support her interpretation of the Policy's coverage provisions.

47. Plaintiff filed a claim for invasive carcinoma. Defendant issued an Explanation of Benefits dated December 15, 2025, reflecting payment of $7,500 under the Non-Invasive Cancer benefit.

48. Defendant denied payment of the remaining $22,500 sought under the Invasive Cancer benefit.

49. Defendant's stated reason was that Plaintiff's cancer did not satisfy its interpretation of the Invasive Cancer definition because the malignancy was not classified as Stage 2 or higher.

50. Defendant thereby treated the Stage IA classification as controlling the benefit determination, notwithstanding the pathological diagnosis of invasive carcinoma and Grade 2 invasive carcinoma.

51. Plaintiff's diagnosis and treatment were documented by her treating breast surgical oncologist, Laila Samaiian, M.D., of Baptist MD Anderson Cancer Center.

52. On January 8, 2026, Dr. Samaiian authored a letter addressed to Anthem's Cancer Policy Review Department.

53. The letter confirmed that Plaintiff had been diagnosed with invasive ductal carcinoma of the right breast.

54. Dr. Samaiian specifically described the malignancy as Grade 2 invasive ductal carcinoma with associated DCIS.

55. Dr. Samaiian identified multifocal breast cancer consisting of invasive ductal carcinoma and invasive lobular carcinoma components.

56. On January 9, 2026, Plaintiff submitted Dr. Samaiian's January 8, 2026 letter to Defendant in connection with the administrative appeal of the Critical Illness Insurance benefit determination.

57. Defendant therefore received the physician's detailed description of Plaintiff's invasive malignancies before issuing its final adverse benefit determination.

58. The letter constituted material medical evidence relevant to the proper interpretation and application of the Policy's cancer definitions.

59. Plaintiff timely appealed Defendant's partial denial of benefits.

60. Defendant's final appeal determination identifies January 5, 2026, as the date it received Plaintiff's appeal request.

61. Plaintiff sought payment of the additional $22,500 representing the difference between the Invasive Cancer benefit ad the amount already paid.

62. On January 9, 2026, Plaintiff submitted Dr. Samaiian's January 8, 2026 letter as additional supporting medical evidence.

63. The letter confirmed the diagnosis of invasive ductal carcinoma and identified a separate invasive lobular carcinoma component.

64. Defendant had the opportunity to consider the medical documentation and Plaintiff's contentions concerning the invasive nature of the malignancy.

65. On February 20, 2026, Defendant issued its final adverse benefit determination upholding the partial denial.

66. Defendant maintained that its payment of $7,500 was consistent with the Policy's Non-Invasive Cancer benefit.

67. The final determination advised Plaintiff of her right to bring a civil action under ERISA § 502(a)(1)(B).

68. Plaintiff has exhausted the administrative appeal procedure made available by Defendant.

69. Plaintiff contends that Defendant improperly interpreted and applied the Policy's Invasive Cancer and Non-Invasive Cancer provisions.

70. The Policy expressly describes Invasive Cancer by reference to a malignancy involving invasion of normal tissue.

71. Plaintiff's medical records and treating physician's letter establish the existence of pathologically confirmed invasive breast malignancies.

72. Plaintiff contends that Defendant's interpretation fails to give adequate independent effect to the Policy's description of tissue invasion and the confirmed medical diagnosis.

73. Plaintiff further contends that the Policy's use of both tissue-invasion terminology and staging classifications creates a material interpretive question regarding the scope of the Invasive Cancer benefit.

74. Plaintiff contends that the proper construction of the entire Policy, including the relevant definitions, benefit schedule, exclusions, and any applicable master policy provisions, supports entitlement to the additional benefit.

75. Alternatively, to the extent the Court determines that the governing provisions are ambiguous, Plaintiff requests application of the interpretive principles appropriate under ERISA and the applicable standard of review.

76. The Certificate includes a provision granting Defendant discretionary authority to determine eligibility for benefits and interpret Policy provisions.

77. To the extent de novo review applies, Plaintiff contends that the correct interpretation of the Policy entitles her to the full Invasive Cancer benefit.

78. To the extent deferential review applies, Plaintiff contends that Defendant's determination was unreasonable because it failed to adequately reconcile the tissue-invasion language with the medical evidence and the other relevant provisions of the Policy.

79. Plaintiff further contends that Defendant's final determination did not adequately explain why the confirmed invasive malignancies failed to satisfy the Policy's tissue-invasion description beyond its reliance on the Stage IA classification.

80. Defendant's interpretation and resulting refusal to pay the additional benefit are the subject of this action.

**COUNT I – DECLARATORY JUDGMENT RECOVERY OF BENEFITS DUE UNDER THE TERMS OF THE PLAN 29 U.S.C. § 1132(a)(1)(B)**

81. Plaintiff realleges and incorporates Paragraphs 1 through 80 as though fully set forth herein.

82. Plaintiff was a covered participant or beneficiary under the Critical Illness Insurance Plan.

83. Plaintiff seeks recovery of the additional $22,500 in insurance benefits allegedly due under the terms of Group Critical Illness Insurance Policy No. 270017, together with prejudgment interest, reasonable attorney's fees and costs under 29 U.S.C. § 1132(g)(1), and such other relief as the Court deems appropriate.

84. Defendant issued and insured the Policy and was responsible for the benefit determination challenged in this action.

85. The Policy established the contractual terms under which Defendant was required to pay Critical Illness Insurance benefits.

86. The Policy definition of Invasive Cancer States:

> **Invasive Cancer** means a condition Diagnosed as the presence of a malignancy characterized by the uncontrolled and abnormal growth and spread of malignant cells with invasion of normal tissue as diagnosed by a Physician, who is board certified in the medical specialty that is appropriate for the type of cancer involved.
>
> Invasive Cancer includes **any cancer classified as Stage 2 through 4**, or **its equivalent**.
>
> Invasive Cancer does not include a Diagnosis of Invasive Cancer for:
>
> 1) any tumor in the presence of human immuno-deficiency virus;
> 2) any non-melanoma skin cancer; or
> 3) any condition that is considered Non-Invasive Cancer.

*See* Pg. 10, Policy.

87. Plaintiff was diagnosed with breast cancer while insured under the Policy.

88. The pathological findings established Grade 2 invasive ductal carcinoma and a separate invasive lobular carcinoma component.

89. Plaintiff submitted a claim seeking the $30,000 Invasive Cancer benefit.

90. Defendant paid $7,500 under the Non-Invasive Cancer benefit and denied the remaining $22,500.

91. Plaintiff timely appealed the determination and submitted additional medical evidence supporting the invasive nature of her malignancies.

92. Defendant upheld its partial denial on February 20, 2026.

93. Plaintiff contends that Defendant incorrectly interpreted and applied the governing Policy provisions and that the additional $22,500 is due under the proper construction of the Plan.

94. Plaintiff further contends that Defendant's determination was erroneous under de novo review or, to the extent deferential review applies, unreasonable under the governing Plan terms and relevant evidence.

95. Defendant has failed and refused to pay the additional benefits claimed by Plaintiff.

96. Plaintiff has exhausted the applicable administrative remedies.

97. As a result of Defendant's determination, Plaintiff has been deprived of $22,500 in insurance benefits she contends are due under the Policy.

98. Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff seeks recovery of those benefits and enforcement of her rights under the Plan and attorneys fees and costs.

99. Plaintiff requests judgment against Defendant for the benefits due under the Plan, after credit for the $7,500 previously paid.

**XI. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, A.L., respectfully requests that this Court enter judgment in her favor and against Defendant, ANTHEM INSURANCE COMPANIES, INC., and:

A. Determine that Defendant's denial of the additional Invasive Cancer benefit was erroneous under the applicable ERISA standard of review;

B. Determine that Plaintiff is entitled to the full $30,000 Invasive Cancer benefit under the governing Plan;

C. Award Plaintiff $22,500 in unpaid benefits, after credit for the $7,500 previously paid;

D. Award prejudgment interest on the unpaid benefits at a rate determined by the Court;

E. Award reasonable attorney's fees and taxable costs pursuant to 29 U.S.C. § 1132(g)(1), to the extent authorized by law;

F. Alternatively, if the Court determines that further administrative consideration is required, remand the claim for a full and fair review consistent with the Court's findings;

G. Award post judgment interest pursuant to 28 U.S.C. § 1961; and

H. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8925 SW 148 Street, Suite 216
Miami, FL 33176
Phone: (305) 677-2292
Fax: (305) 677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

**By: /s/ Maria T. Santi**
MARIA T. SANTI, ESQUIRE
Florida Bar No.: 117564

# EXHIBIT "A"



# Voluntary
# Critical Illness Insurance

# Certificate of Coverage

| | |
|---|---|
| **Plan Sponsor:** | Intercontinental Exchange, Inc |
| **Policy:** | 270017 |
| **Class:** | 02 |
| **Class Description:** | All Eligible Employees Electing $30,000 Benefit |

**anthem.com**

Anthem Blue Cross and Blue Shield is the trade name of: In Colorado: Rocky Mountain Hospital and Medical Service, Inc. HMO products underwritten by HMO Colorado, Inc. In Indiana: Anthem Insurance Companies, Inc. In Georgia: Anthem Insurance Companies, Inc. In Kentucky: Anthem Health Plans of Kentucky, Inc. In Missouri (excluding 30 counties in the Kansas City area): RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. In Nevada: Rocky Mountain Hospital and Medical Service, Inc. HMO products underwritten by HMO Colorado, Inc., dba HMO Nevada. In Ohio: Community Insurance Company. In Virginia: Anthem Health Plans of Virginia, Inc. trades as Anthem Blue Cross and Blue Shield in Virginia, and its service area is all of Virginia except for the City of Fairfax, the Town of Vienna, and the area east of State Route 123. In Wisconsin: Blue Cross Blue Shield of Wisconsin (BCBSWI), underwrites or administers PPO and indemnity policies and underwrites the out of network benefits in POS policies offered by Compcare Health Services Insurance Corporation (Compcare) or Wisconsin Collaborative Insurance Corporation (WCIC). Compcare underwrites or administers HMO or POS policies; WCIC underwrites or administers Well Priority HMO or POS policies. Independent licensees of the Blue Cross and Blue Shield Association. ANTHEM is a registered trademark of Anthem Insurance Companies, Inc.

# GROUP CRITICAL ILLNESS INSURANCE CERTIFICATE

Anthem Insurance Companies, Inc.
220 Virginia Avenue
Indianapolis, IN 46204

Anthem BlueCross BlueShield

**<u>Anthem Insurance Companies, Inc.</u>**

**Policyholder:** Intercontinental Exchange, Inc
**Policy Number:** 270017
**Policy Effective Date:** January 1, 2022
**Policy Anniversary:** January 1

We have issued the Policy to the Policyholder. The Policy is delivered in and governed by the laws of the state of Georgia. The provisions of the Policy that are important to the Covered Person(s) are summarized in this Certificate, consisting of this form and any additional forms which have been made a part of this Certificate. This Certificate replaces any other Certificate We may have previously issued to the Primary Insured under the Policy. The Policy alone is the only contract under which payment will be made. Any difference between the Policy and this Certificate will be settled according to the provisions of the Policy on file with Us at Our Home office. The Policy may be inspected at the office of the Policyholder.

Signed for Anthem Insurance Companies, Inc.



Pamela J. Stahl
President, Anthem Insurance Companies, Inc.

**THIS IS A LIMITED BENEFIT CERTIFICATE: This Certificate provides limited or supplemental coverage. It pays benefits ONLY upon the occurrence and Diagnosis of a Critical Illness with the exception of the Health Screening Benefit. This Certificate does not provide benefits for any other disease, sickness or incapacity. Benefits provided are supplemental and are not intended to substitute for medical coverage or disability insurance.**

## THIS IS NOT A MEDICARE SUPPLEMENT CONTRACT. If You are eligible for Medicare, review the Guide to Health Insurance for People With Medicare available from Us.

**READ YOUR CERTIFICATE CAREFULLY:** You have a 30 day right from the Primary Insured's Coverage Effective Date to examine Your Certificate. If You are not satisfied, You may return it to Us within 30 days from the date You received Your Certificate. In that event, We will consider it void from its effective date and any premiums paid will be refunded. Any claims paid under the Policy during the initial 30 day period will be deducted from the refund.

*A note on capitalization in this Certificate:*
Capitalization of a term, not normally capitalized according to the rules of standard punctuation, indicates a word or phrase that is a defined term in the Policy or refers to a specific provision contained herein.

**Anthem Blue Cross and Blue Shield is the trade name of Anthem Insurance Companies, Inc. Independent licensee of the Blue Cross and Blue Shield Association. ANTHEM is a registered trademark of Anthem Insurance Companies, Inc.**

## TABLE OF CONTENTS

**Section: .......... Page:**

**Benefit Schedule .......... 3**

**Definitions .......... 6**

**Eligibility & Effective Dates .......... 14**

**Termination of Coverage .......... 16**

**Continuation .......... 17**

**Critical Illness Benefits .......... 20**

**Exclusions .......... 21**

**Claim Provisions .......... 22**

**General Provisions .......... 24**

## BENEFIT SCHEDULE

**Eligible Class(es)**
Actively at work Employees who are scheduled to work at least 30 hours per week and who have satisfied any applicable eligibility waiting periods as defined by the policyholder.

**Policy Age Limit:** 85

**Individual Grace Period:** 31 days

**Cost of Coverage:**
Contributory – You must contribute toward the cost of coverage.

**Coverage Amount:**

| | |
|---|---|
| **Primary Insured:** | $30,000 |
| **Spouse or Partner:** | $15,000 |
| **Dependent Child(ren):** | $15,000 |

**Guaranteed Issue Amount:** $30,000

**Primary Insured Coverage Maximum**:
You may receive multiple Critical Illness Benefit payments and Recurrence Benefit payments until a maximum of 2500% of the Primary Insured's Critical Illness Coverage Amount is reached in Your lifetime under the Policy. The Coverage Maximum does not include any Additional Critical Illness Benefits. In no event will Your Coverage Maximum exceed $250,000.

**Spouse or Partner Coverage Maximum**:
Your Spouse or Partner may receive multiple Critical Illness Benefit payments and Recurrence Benefit payments until a maximum of 2500% of the Spouse's or Partner's Critical Illness Coverage Amount is reached in Your Spouse's or Partner's lifetime under the Policy. The Coverage Maximum does not include any Additional Critical Illness Benefits. In no event will your Spouse's or Partner's Coverage Maximum exceed $250,000.

**Child(ren) Coverage Maximum:**
Each Child may receive multiple Critical Illness Benefit payments and Recurrence Benefit payments until a maximum of 2500% of the Child's Coverage Amount is reached while covered as a Dependent Child under the Policy. The Coverage Maximum does not include any Additional Critical Illness Benefits. In no event will Your Child's Coverage Maximum exceed $250,000.

## CRITICAL ILLNESS BENEFITS

| Critical Illnesses | Percentage of Coverage Amount |
|---|---|
| **Cancer Benefits** | |
| Invasive Cancer | 100% |
| Non-Invasive Cancer | 25% |
| Benign Brain Tumor | 100% |
| **Vascular Benefits** | |
| Heart Transplant | 100% |
| Heart Attack (Myocardial Infarction) | 100% |
| Stroke | 100% |
| Coronary Artery Bypass Graft | 25% |
| **Other Specified Critical Illness Benefits** | |
| Coma | 100% |
| Paralysis | 100% |
| Major Organ Transplant | 100% |
| End Stage Renal Disease | 100% |
| Loss of Hearing | 100% |
| Loss of Speech | 100% |
| Loss of Vision | 100% |
| **Neurological Benefits** | |
| Advanced Parkinson's Disease | 100% |
| Amyotrophic Lateral Sclerosis (ALS or "Lou Gehrig's Disease") | 100% |
| Advanced Multiple Sclerosis | 100% |
| Advanced Alzheimer's Disease | 100% |
| **Child-Specified Benefits** | |
| Muscular Dystrophy | 25% |
| Cerebral Palsy | 25% |
| Cystic Fibrosis | 25% |
| Spina Bifida | 25% |
| Congenital Heart Disease | 25% |

Each covered Critical Illness Benefit listed will only be paid once for each Covered Person.

| Recurrence Benefit | Percentage of Original Benefit Amount |
|---|---|
| Invasive Cancer | 100% |
| Benign Brain Tumor | 100% |
| Heart Transplant | 100% |
| Heart Attack (Myocardial Infarction) | 100% |
| Stroke | 100% |
| Coma | 100% |
| Major Organ Transplant | 100% |

Subject to the Covered Person's coverage maximum shown above, the Recurrence Benefit is only payable if a Critical Illness Benefit has been paid for the same Critical Illness. In order to receive a Recurrence Benefit, all other conditions stated in the Recurrence Benefit provision must be satisfied. Only one Recurrence Benefit is payable for each covered benefit.

## ADDITIONAL CRITICAL ILLNESS BENEFITS

| Benefits | Coverage Amount |
| --- | --- |
| Health Screening Benefit | $50 |
| Skin Cancer Benefit | $250 |

## DEFINITIONS

**Actively at Work, Active Work** means that an Employee is:

1) performing all the regular duties of his/her job for the Policyholder in the usual way for 30 or more hours each week; and
2) receiving compensation from the Policyholder for work performed.

An Employee is considered actively at work on any day that is not his/her regular scheduled workday (e.g., vacation or holiday) as long as the Employee was actively working on his/her last preceding regular scheduled workday.

**Additional Enrollment Event** means a period of time designated for enrollment under the Policy, other than an Annual Enrollment Period, as agreed to in writing by Our authorized representative in our Home Office.

**Advanced Alzheimer's Disease** means a condition Diagnosed as Alzheimer's disease that has progressed to a classification of Stage 6 or greater of the Functional Assessment Staging Test (FAST), or equivalent test. Diagnosis must be made by a Physician who is a board-certified neurologist, and must be supported by neurological examination and cognitive testing for the involved condition/illness. There must be permanent clinical loss of the ability to do all of the following:

1) remember, reason, and perceive; and
2) understand, express and give effect to ideas.

Other types of dementia are not included in this definition. The initial Diagnosis of Alzheimer's disease must occur while the Covered Person is insured under the Policy.

**Advanced Multiple Sclerosis ("MS")** means a condition Diagnosed as the occurrence of at least two episodes of well-defined neurological abnormalities, with objective evidence of lesions that are characteristic of MS at more than one site within the central nervous system. Advanced Multiple Sclerosis must be Diagnosed by a Physician who is a board certified neurologist and the Diagnosis must be supported by modern imaging, investigative techniques and/or analysis of cerebrospinal fluid consistent with the Diagnosis.

The initial Diagnosis of Advanced MS must occur while the Covered Person is covered under the Policy.

**Advanced Parkinson's Disease** means a condition Diagnosed as Parkinson's Disease which has progressed to a classification of Stage 4 or greater. Diagnosis must be made by a board certified or board eligible neurologist based on abnormal findings from neurological examination, cognitive testing, and results of imaging studies. There must be permanent clinical impairment of motor function with associated tremor, muscle rigidity and postural instability. Other Parkinsonian syndromes are not included in this definition.

The initial Diagnosis of Advanced Parkinson's Disease must occur while the Covered Person is covered under the Policy.

**Amyotrophic Lateral Sclerosis (ALS or "Lou Gehrig's Disease")** means a condition Diagnosed as progressive degenerative motor neuron disease, marked by muscular weakness and atrophy with spasticity and hyperreflexia due to a degeneration of anterior horn cells of the spinal cord and cranial nerves and is Middle Stage according to the Muscular Dystrophy Association. Other motor neuron diseases are not considered to be ALS. ALS must be Diagnosed by a Physician who is a board certified neurologist based on generally acceptable principles of medicine.

The initial Diagnosis of ALS must occur while the Covered Person is covered under the Policy.

**Aneurysm** means a condition Diagnosed as a localized, blood-filled dilation of a blood vessel caused by disease or weakening of the vessel wall in the brain, carotid arteries, or aorta for which surgical correction has been performed or is Medically Necessary. Aorta refers to the thoracic and abdominal aorta, but not its branches. Diagnosis must be supported by medical records which include radiographically specific studies such as, but not limited to, angiography, CT scan, MRI, or ultrasound.

**Angioplasty/Stent** means a condition Diagnosed as heart disease that has progressed such that reconstitution or recanalization of a blood vessel is Medically Necessary. Angioplasty surgery may involve balloon dilation, mechanical stripping of intima, forceful injection of fibrinolytics or placement of a stent.

**Annual Enrollment Period** means a period of time during which annual benefits enrollment occurs each year as determined by the Policyholder.

**Benign Brain Tumor** means a condition Diagnosed as a non-malignant tumor or cyst in the brain, cranial nerves or meninges within the skull with a minimum size of 1 cm, resulting in either surgical removal or permanent neurological deficit with persisting clinical symptoms. The tumor, including its size, should be documented on an MRI of the brain (with and without contrast) or by pathological diagnosis. If the Covered Person is unable to undergo an MRI of the brain (the study is deemed inappropriate for safety reasons such as the presence of metallic foreign bodies; mechanical reasons such as body habitus; or unavailability), then the tumor should be documented by a CT scan of the head, with and without contrast.

Benign Brain Tumor does not include:
1) tumors in the pituitary gland; or
2) angiomas.

**Cerebral Palsy** means a condition Diagnosed as a non-progressive neurological defect affecting muscle control characterized by spasticity and incoordination of movements. Other similar conditions such as degenerative nervous disorders, genetic diseases, muscle diseases, metabolic disorders, nervous system tumors, coagulation disorders, or other injuries or disorders which delay early development, but can be outgrown, are not included in this definition.

The Diagnosis of Cerebral Palsy must be made by a Physician board certified in neurology or a pediatrician who specializes in neurodevelopmental disorders.

The initial Diagnosis of Cerebral Palsy must occur while the Covered Person is covered under the Policy.

**Certificate** means this document, which explains the insurance benefits provided, to whom and how benefits are payable and exclusions and limitations that apply to coverage.

**Change in Family Status** means one of the following events:
1) You get married or enter into a relationship with a person who satisfies the definition of Partner;
2) You and Your Spouse divorce or You and Your Partner legally terminate Your relationship;
3) Your Spouse or Partner dies;
4) You acquire a child who satisfies the definition of Dependent Child;
5) Your child no longer satisfies the definition of a Dependent Child or dies; or
6) Your Spouse or Partner is no longer employed, which results in a loss of critical illness insurance sponsored by the Spouse's or Partner's employer for You or any Dependent(s).

**Coma** means a condition Diagnosed as a continuous state of profound unconsciousness with no reaction to external stimuli which is not the result of a Stroke. The Coma must:
1) be due to disease;
2) be Diagnosed while the Covered Person is covered under the Policy;
3) last for a period of 7 or more consecutive days; and
4) be rated/classified by at least one of the following scales:
    a) Rancho Los Amigos Scale (RLAS) as a level I or II;
    b) Glasgow Coma Scale values of 3 through 5; or

c) the disability rate scale with values of 22 through 29.

The condition must require mechanical ventilation for respiratory assistance. For purposes of the Policy, Coma does not include a medically induced coma or a coma caused or contributed to by alcohol or substance abuse.

**Congenital Heart Disease** means a condition Diagnosed as at least one of the following covered heart conditions:

1) coarctation of the aorta;
2) Ebstein's anomaly;
3) Eisenmenger syndrome;
4) tetralogy of Fallot;
5) transposition of the great vessels;
6) total anomalous pulmonary venous connection;
7) atresia of any heart valve;
8) single ventricle;
9) hypoplastic left heart syndrome;
10) truncus arteriosus;
11) double outlet left or right ventricle; or
12) any other congenital cardiac condition that requires life-saving surgery to survive.

It also means a specific condition for which it is Medically Necessary that open heart surgery be performed.

The Diagnosis of Congenital Heart Disease must be made by a Physician board certified in cardiology and must be supported by cardiac imaging. If the Covered Person is determined to be too ill to undergo surgery, but otherwise meets the criteria for the need for the surgery, the surgery requirement will be waived.

**Contributory Coverage** means coverage for which You are required to contribute toward the cost.

**Coronary Artery Bypass Graft** means a condition Diagnosed as heart disease that necessitates heart surgery to correct narrowing or blockage of one or more coronary arteries with bypass grafts. The surgery must be Medically Necessary as determined by a Physician board certified in cardiology.

**Coverage Amount** is the dollar amount You or Your Dependents are covered for a Critical Illness.

**Covered Person** means the Employee and any Dependent(s) who is/are currently insured under the Policy and this Certificate.

**Critical Illness** means any of the conditions shown in the Benefit Schedule.

**Cystic Fibrosis** means a condition Diagnosed as a recessive genetic disease affecting the lungs and pancreas, liver, and intestine. It is characterized by abnormal transport of chloride and sodium across the epithelium leading to thick viscous secretions. The Diagnosis of Cystic Fibrosis must be confirmed by a positive sweat test.

The initial Diagnosis of Cystic Fibrosis must occur while the Covered Person is covered under the Policy.

**Dependent, Dependents** means an Employee’s Spouse or Partner and Dependent Child(ren).

**Dependent Child(ren)** means:

1) an Employee’s or Spouse’s or Partner’s natural child, legally adopted child or stepchild;
2) a child placed into the Employee’s or Spouse’s or Partner’s custody for adoption (regardless of whether the adoption has become final);

3) a child for whom the Employee or Spouse or Partner is ordered by a court or administrative order to provide coverage regardless of whether he/she is the custodial or non-custodial parent;
4) any other child for whom the Employee or Spouse or Partner has been appointed legal guardian; or who is/are under 26 years of age.

If a child is age 26 or older and is:
1) incapable of self-sustaining employment because of a mental or physical disability;
2) chiefly dependent on the Employee, or Spouse or Partner for financial support and maintenance; and proof has been provided of his/her disability upon Our request, that child will continue to be a dependent child until these conditions cease to exist.

**Diagnosed, Diagnosis** means the definitive establishment of a Critical Illness through the use of clinical or laboratory findings. The Diagnosis must be made by a Physician who is a board certified specialist where required in the Policy.

**Employee** means a person who:
1) is a citizen or legal resident of the United States (including its territories and protectorates); or
2) is lawfully and legally able to work in the United States pursuant to applicable law(s); and
3) works for the Policyholder on a regular basis in the usual course of the Policyholder's business.

This definition does not include a person working for the Policyholder:
1) on a temporary, leased or seasonal basis;
2) as an independent contractor (including persons for whom income is reported on a 1099 form);
3) subject to the terms of a leasing agreement between the Policyholder and a leasing organization; or
4) who resides outside the United States for a period in excess of 12 months, unless written approval has been received from Us.

**End Stage Renal Disease** means a condition Diagnosed as kidney disease which has resulted in permanent and irreversible failure of both kidneys requiring regular treatment by either hemodialysis or peritoneal dialysis on a no less than weekly basis, or for which kidney transplant is Medically Necessary.

**Family Member** means a Covered Person's Spouse (current and former); Partner; child; sibling; parent; grandparent; grandchild; aunt; uncle; first cousin; nephew; niece; or the spouse or Partner of such individuals. This includes adopted, in-law and step-relatives, and anyone living in the Covered Person's household.

**Heart Attack** means a condition Diagnosed as acute myocardial infarction resulting in the death of a portion of the heart muscle (myocardium) due to a blockage of one or more coronary arteries and resulting in the loss of the normal function of the heart.

The Diagnosis must be made by a Physician board certified in cardiology. Significant electrocardiogram (EKG) changes must be seen and the Diagnosis of an acute myocardial infarction (heart attack) with resulting loss of normal heart function must be confirmed by one or both of the following:
1) a clinical picture of myocardial infarction with cardiac enzyme changes found in blood (elevated DK-MB isoenzyme fraction or elevated troponins);
2) confirmatory imaging tests such as a nuclear imaging test or echocardiogram that is consistent with a myocardial infarction.

Heart Attack does not include:
1) established (old) myocardial infarction;
2) congestive heart failure;
3) atherosclerosis;
4) angina;
5) coronary artery disease;
6) or any other dysfunction of the cardiovascular system;

7) cardiac arrest not caused by a myocardial infarction; or
8) heart attacks that occur during clinical procedures.

In the event of death, an autopsy confirmation and/or death certificate identifying Heart Attack as the cause of death will be accepted.

**Heart Transplant** means:

1) a condition Diagnosed as heart failure due to heart disease and for which a Covered Person is placed on a national transplant list such as UNOS; and
2) the irreversible failure of the Covered Person's heart has occurred for which a Physician has determined that the replacement of such organ with a human donor heart is Medically Necessary.

If the Covered Person is too ill for a transplant, but otherwise meets the criteria to be placed on the UNOS or other national transplant list, the placement on such list will be waived.

**Home Office** means Our office at 220 Virginia Avenue, Indianapolis, IN 46204.

**Individual Grace Period** means a period of time from the Premium Due Date for payment of each premium due after the initial premium. The Covered Person's insurance will be continued during the Individual Grace Period.

The Individual Grace Period will not continue coverage beyond a date shown in the Termination provision.

The Individual Grace Period is shown in the Benefit Schedule.

**Invasive Cancer** means a condition Diagnosed as the presence of a malignancy characterized by the uncontrolled and abnormal growth and spread of malignant cells with invasion of normal tissue as diagnosed by a Physician, who is board certified in the medical specialty that is appropriate for the type of cancer involved.

Invasive Cancer includes any cancer classified as Stage 2 through 4, or its equivalent.

Invasive Cancer does not include a Diagnosis of Invasive Cancer for:

1) any tumor in the presence of human immuno-deficiency virus;
2) any non-melanoma skin cancer; or
3) any condition that is considered Non-Invasive Cancer.

**Loss of Hearing** means a condition Diagnosed as the irreversible loss of hearing for all sounds in both ears, due to disease. The Diagnosis of irreversible loss of hearing must be made by a licensed professional or specialist in the applicable field of medicine and established by an audiometric and auditory threshold test. The auditory threshold cannot be more than 90 decibels in both ears while utilizing a hearing aid.

The loss of hearing must occur after the Covered Person becomes insured under the Policy.

**Loss of Speech** means a condition Diagnosed as the irreversible loss of ability to speak, due to disease. The Diagnosis of irreversible loss of speech must be made by a licensed professional or specialist in the applicable field of medicine and must include documented evidence of the loss for at least 12 months.

The loss of speech must occur after the Covered Person becomes insured under the Policy.

**Loss of Vision** means a condition Diagnosed as the irreversible loss of vision in both eyes due to disease. The Diagnosis of irreversible loss of vision must be made by a licensed professional or specialist in the applicable field of medicine and must indicate that corrective visual acuity is equal to or worse than 20/200 in both eyes or the field of vision is less than 20 degrees in both eyes.

The irreversible loss of vision must occur after the Covered Person becomes insured under the Policy.

**Major Organ Transplant** means:

1) a Diagnosis of organ failure due to disease of the affected organ and for which a Covered Person is placed on a national transplant list such as UNOS; and
2) the irreversible failure of the Covered Person's lung, pancreas or any combination thereof, for which a Physician has determined that the complete replacement of such organ with an entire organ from a human donor is Medically Necessary; or
3) the irreversible failure of the Covered Person's liver for which a Physician has determined that the complete or partial replacement of the liver with a liver or liver tissue from a human donor is Medically Necessary. For this type of transplant, the requirement of placement on a national transplant list, such as UNOS, is specifically null in cases of live donor transplant.

Organs transplanted simultaneously with the heart are covered under Heart Transplant.

If the Covered Person is too ill for a transplant, but otherwise meets the criteria to be placed on the UNOS or other national transplant list, the placement requirement will be waived.

**Medically Necessary** means:

1) recommended by a Physician acting within the scope of his or her license; and
2) consistent with currently accepted medical practice.

**Muscular Dystrophy** means a condition Diagnosed as one of a group of muscle diseases characterized by progressive skeletal muscle weakness, defects in muscle proteins, and the death of muscle cells and tissue. The Diagnosis of Muscular Dystrophy must be confirmed by electromyography and muscle biopsy. Spinal muscular atrophy does not satisfy the definition of Muscular Dystrophy.

**Non-Contributory Coverage** means coverage for which You are not required to contribute toward the cost.

**Non-Invasive Cancer** means a condition Diagnosed as:

1) Stage I or its equivalent; or
2) carcinoma in situ classified as TisN0M0, for which radiotherapy, intravenous chemotherapy, or surgical procedures are Medically Necessary to control or cure the disease.

Non-Invasive Cancer does not include a condition Diagnosed as:

1) any benign tumor, dysplasia, intraepithelial neoplasia or pre-malignant growth;
2) any tumor in the presence of human immuno-deficiency virus;
3) any non-melanoma skin cancer; or
4) any melanoma in situ classified as TisN0M0 under TNM staging.

**Paralysis** means a condition Diagnosed as the complete and permanent loss of function of two or more limbs due to disease. Paralysis as a result of Stroke is excluded. The Diagnosis of Paralysis must include documented evidence of the illness that caused the Paralysis. As used herein, “limb” means an arm or leg.

The Paralysis must occur after the Covered Person becomes insured under the Policy.

**Partner** means an individual who is a partner to an Employee in a civil union or domestic partnership, or other relationship as recognized and allowed by applicable federal law, state law, or law of the county, city or local government in the Employee's jurisdiction of residence, if:

1) an Employee provides acceptable evidence that the requirements of the jurisdiction in which he/she resides for the establishment of the relationship have been met;
2) an Employee submits a written declaration of partnership signed by both parties acceptable to Us; or

3) the Employee and his/her partner satisfy the Policyholder's requirements for such partnerships.

**Physician** means a person who is:
1) a doctor of medicine, osteopathy, psychology or where required by state law, any other legally qualified practitioner of healing art;
2) licensed to practice in the jurisdiction where care is being given;
3) operating within the scope of his or her license; and
4) not the Covered Person or a Family Member.

**Policy** means the policy that We issued to the Policyholder under the Policy Number shown on the face page.

**Policyholder** means the Employer.

**Primary Insured** means an Employee who is currently insured under the Policy and this Certificate. (See also You, Yours.) This definition also includes a Spouse or Partner who has elected to continue coverage under the Extended Continuation provision.

**Prior Policy** means the Critical Illness insurance policy carried or sponsored by the Employer or an Employer acquired by the Policyholder on the day before the Policy Effective Date and will only include the coverage which is transferred to Us.

**Skin Cancer** means basal cell carcinoma and squamous cell carcinoma.

**Spina Bifida** means a congenital defect, Diagnosed by a Physician, caused by failure of the spine to close properly allowing the spinal cord and its protective covering (meninges) to protrude through the skin, characterized by varying degrees of the following: hydrocephalus, paralysis, bowel problems and bladder problems relating to control of urine.

For purposes of the Policy, Spina Bifida does not include spina bifida occulta.

**Spouse** means any individual who, under applicable state law, is recognized as the spouse of an Employee.

**Stroke** means a condition Diagnosed as a cerebrovascular accident including infarction of brain tissue, cerebral and subarachoid hemorrhage, cerebral embolism and cerebral thrombosis.

The diagnosis must be supported by:
1) evidence of persistent neurological deficits confirmed by a neurologist at least 30 days after the event; and
2) confirmatory neuroimaging studies consistent with the diagnosis of a new Stroke.

Stroke does not mean a head injury, transient ischemic attack (TIA), or chronic cerebrovascular insufficiency.

Stroke does not include a Diagnosis of Stroke for:
1) cerebral symptoms due to migraine;
2) cerebral injury resulting from trauma or hypoxia; or
3) vascular disease affecting the eye or optic nerve or vestibular functions.

In the event of death, an autopsy confirmation and/or death certificate identifying Stroke as the cause of death will be accepted.

**We, Us, Our** means Anthem Insurance Companies, Inc.

**You, Yours** means an Employee who is currently insured under the Policy and this Certificate. (See also Primary Insured.) This definition also includes a Spouse or Partner who has elected to continue coverage under the Extended Continuation provision.

## ELIGIBILITY & EFFECTIVE DATES

**Eligibility for Coverage**
An Employee will become eligible for coverage under the Policy on the latest of:

1) the Policy Effective Date; or
2) the date he/she becomes a member of an Eligible Class

A Dependent will become eligible for coverage under the Policy on the later of:

1) the date the Employee becomes insured under the Policy; or
2) the date You acquire the Dependent.

If more than one person within an immediate family unit is eligible for coverage under the Policy as an Employee of the Policyholder, then:

1) neither Employee may be covered as a Dependent of the other person; and
2) Dependent Child(ren) may only be covered as a Dependent of one Employee.

The date on which an Employee or Dependent becomes eligible for coverage may not be the same date on which insurance begins. The Coverage Effective Date provision describes the date on which insurance begins.

**Initial Enrollment**
An Employee must enroll for coverage for the Employee and any Dependent(s) within 31 days following the day the Employee or Dependent(s) first become(s) eligible for coverage under the Policy.

If an Employee does not enroll for coverage and/or Dependent’s coverage during the Employee’s or Dependent’s initial enrollment period and later chooses to enroll, the Employee may only enroll for coverage and/or Dependent’s coverage:

1) during an Annual Enrollment Period or any Additional Enrollment Event designated by the Policyholder; or
2) within 31 days of the date the Employee has a Change in Family Status.

**Coverage Effective Date**
Coverage will start on the latest to occur of:

1) the date an Employee or Dependent becomes eligible as described in the Eligibility for Coverage provision, if enrolled on or before that date;
2) the Policy Anniversary following the last day of an Annual Enrollment Period, if an Employee or Dependent is enrolled during an Annual Enrollment Period;
3) the first day of the month following the last day of an Additional Enrollment Event, if an Employee or Dependent is enrolled during an Additional Enrollment Event; or
4) the date an Employee or Dependent is enrolled.

In no event will Dependent insurance become effective before an Employee becomes insured.

The Coverage Effective Date for any Employee or Dependent is subject to the Deferred Coverage Effective Date provision.

**Deferred Coverage Effective Date**
All Coverage Effective Dates and Changes in Coverage effective dates for an Employee will be deferred if an Employee is not Actively at Work on the day coverage would otherwise begin. If deferred, coverage will become effective on the day after the date the Employee has completed one full day of Active Work.

In no event will Dependent insurance become effective before an Employee becomes insured.

This provision does not apply to Employees who are currently eligible for coverage under the Continuity from a Prior Policy provision.

**Continuity from a Prior Policy**
Coverage under the Policy will begin and will not be deferred if, on the day before the Policy Effective Date, an Employee:

1) was insured under a Prior Policy; and
2) is otherwise eligible under the Policy but is not Actively at Work on the Policy Effective Date and:
   a. is on a leave of absence protected under:
      i. the federal Family and Medical Leave Act (FMLA) or Uniformed Services Employment and Reemployment Rights Act (USERRA); or
      ii. any other applicable federal or state law that allows for continuation of insurance in certain instances; or
   b. was eligible for and insured under a continuation provision of a Prior Policy on the day before the Policy Effective Date; provided the Employee is not insured under any continuation, portability or conversion provision of a Prior Policy after the Policy Effective Date.

If coverage is continued for an Employee under this provision, coverage may also be continued for any eligible Dependent(s) who were insured under the Prior Policy. Insurance under this provision is subject to uninterrupted payment of premium to Us when due.

Coverage provided through this provision ends on the first to occur of:

1) the last day of the 12th month on or next following the Policy Effective Date;
2) the last day the Employee would have been covered under the Prior Policy, had the Prior Policy not terminated;
3) the last day of the continuation period allowed by FMLA, USERRA or applicable federal or state law;
4) the date insurance terminates for any reason shown under the Termination of Coverage provision; or
5) the date the Employee resumes Active Work for the Policyholder or begins full-time employment with any other employer.

If an Employee is eligible for insurance under this provision, the Employee is not eligible for insurance under any Continuation provision of this Certificate. Except as stated in this provision, coverage under this provision is subject to all other terms and provisions of the Policy.

**Changes in Coverage**
An Employee may elect, drop, increase, decrease or otherwise change coverage only:

1) during an Annual Enrollment Period or any Additional Enrollment Event; or
2) within 31 days of a Change in Family Status.

Any change in coverage requested by an Employee will become effective on:

1) the Policy Anniversary following the last day of an Annual Enrollment Period, if the change is requested during such period;
2) the first day of the month following the last day of an Additional Enrollment Event, if the change is requested during such event; or
3) the first day of the month following the date on which the change is requested following a Change in Family Status; subject to the Deferred Effective Date.

Any change in coverage requested by the Policyholder or as a result of a change in the terms of the Policy will become effective on the first day of the month following the date of the request or change.

# TERMINATION OF COVERAGE

**Termination of Coverage**
Coverage for You and any Dependent(s) will end on the earliest of the following:
1) the last day of the month following the date You become no longer eligible for insurance under any provision of the Policy;
2) the last day of the month following the date You attain age 85;
3) the last day of the month following the date You are no longer in an Eligible Class or the Policy no longer covers Your class;
4) the date You request We terminate coverage, subject to the Changes in Coverage provision;
5) the last day of the month following the date the required premium is due but not paid, or
6) the date the Policy terminates.

Coverage for a Dependent will also end on the last day of the month following the date a Dependent no longer satisfies the definition of Spouse or Partner or Dependent Child(ren), except for a Dependent Child that reaches the limiting age. Coverage for a Dependent Child that reaches the limiting age will end the last day of the month during which the child attains the limiting age.

When coverage would otherwise end, You or an insured Spouse or Partner, in certain circumstances may be able to continue insurance for You and any Dependent Child(ren):
1) under a Continuation provision; or
2) under the Extended Continuation provision.

Termination of coverage has no effect on benefits payable for Treatment that is received for a Critical Illness or other loss Diagnosed while a Covered Person was insured under the Policy.

**CONTINUATION**

## CONTINUATION

**Continuation**
You may be able to continue coverage for You and any Dependent(s) in certain circumstances when You are no longer Actively at Work. The Continuation Options are explained below.

Any coverage continued under this provision through any of the Continuation Option(s) is subject to the following conditions:

1) We must continue to receive premium payment when due (premiums must be paid by You or paid on Your behalf);
2) the Policyholder must approve the continuation; and
3) if You are eligible for more than one Continuation Option:
    a. the continuation time periods will not be applied consecutively; and
    b. the longest applicable continuation time period from the date You were last Actively at Work will apply.

Coverage continued under this provision will end on the last day of the month on or next following the earliest of the day:

1) the applicable continuation time period has expired, as described in the Continuation Options;
2) You return to Active Work for the Policyholder; or
3) You begin full-time employment with an employer other than the Policyholder.

Coverage continued under this provision will also end in accordance with the Termination of Coverage provision. Except as described in this provision, coverage continued under this provision is subject to all other terms and provisions of the Policy.

**Continuation Option(s)**
**Leave of Absence:** If You are on a leave of absence approved by the Policyholder due to any personal reason, coverage may be continued for up to 12 weeks from the date You ceased Active Work.

**Federal and/or State Laws:** The federal Family and Medical Leave Act (FMLA) and Uniformed Services Employment and Reemployment Rights Act (USERRA) and any amendments thereto, as well as other applicable federal or state laws, may allow continuation of insurance in certain circumstances for medical leaves of absence, military leaves of absence, other leaves of absence, layoff or termination of employment.

If You are not Actively at Work and are eligible to continue insurance under one of these laws, coverage may be continued for up to the time period allowed by the law that enables the continuation. Contact the Policyholder for additional information regarding continuation options that may be available through federal and/or state laws.

**Illness or Injury:** If You are not Actively at Work due to Illness or Injury, coverage may be continued for up to 12 weeks from the date You ceased Active Work.

**Temporary Layoff:** If You are subject to a temporary involuntary layoff by the Policyholder, coverage may be continued for up to 12 weeks from the date You ceased Active Work. If the layoff becomes permanent, this continuation will cease immediately.

**Furlough:** If You are subject to a temporary work furlough by the Policyholder, coverage may be continued for up to 12 weeks from the date You ceased Active Work. If the furlough ends or becomes permanent (employment is terminated), this continuation will cease immediately.

## EXTENDED CONTINUATION

**Extended Continuation**
You or an insured Spouse or Partner, in certain circumstances, may continue coverage under the Policy when insurance would otherwise end under the Termination of Coverage provision.

If You are age 84 or younger, You may be able to continue coverage for You and any insured Dependent(s) under this provision when You:
1) are no longer Actively at Work and are not eligible for coverage under any other Continuation provision in this Certificate; or
2) are no longer employed by the Policyholder, including retirement.

If You are eligible to continue coverage under this provision, then You must elect insurance under this provision in order for any Dependent(s) to remain eligible for coverage.

An insured Spouse or Partner who is age 84 or younger may be able to continue coverage under this provision for him/herself and any insured Dependent Child(ren):
1) in the event of Your death; or
2) in the event of divorce, dissolution of partnership or legal separation from You.
3) when You enter active duty service or training in any military for a period of 31 days or more and are no longer eligible under the Policy as an Employee.

If an insured Spouse or Partner continues coverage under this provision, the Spouse or Partner will become a Primary Insured going forward. Any Dependent Child(ren) may be covered under the Employee, or the Spouse or Partner, but not both.

**Requesting Extended Continuation**
When coverage under the Policy would otherwise end, notice of the right to continue coverage under this provision will be given. To elect Extended Continuation, You or Your insured Spouse or Partner must send a request to Us.

The request and the initial premium due must be received within 31 days after insurance under the Policy would otherwise end. If timely notice is not given, an extension of the period of time in which to request continued coverage under this provision will be allowed. You or Your Spouse or Partner will have 15 days from the date notice is received to submit the request and initial premium. However, in no event will a request be accepted by Us if received more than 91 days after the date coverage under the Policy would otherwise end, even if notice is not received.

Coverage continued under this provision:

1) will become effective on the first day of the month following the date coverage under the Policy would otherwise end, so that there is no interruption in coverage; and
2) is subject to continued payment of premium as due, including any portion of the premium that was previously paid for by the Policyholder.

Coverage continued under this provision will end on the last day of the month during which You resume Active Work for the Policyholder.

Coverage continued under this provision will also end in accordance with the Termination of Coverage provision. Except as described in this provision, coverage continued under this provision is subject to all other terms and provisions of the Policy.

## CRITICAL ILLNESS BENEFITS

**Critical Illness Benefit:**
If a Covered Person is Diagnosed with a Critical Illness, while covered under the Policy, We will pay a Critical Illness Benefit. The Critical Illness Benefit is equal to the Coverage Amount multiplied by the Percentage of Coverage Amount for the Critical Illness, as shown in the Benefit Schedule for each Covered Person.

Subject to the Coverage Maximums shown in the Benefit Schedule:

1) Cancer Benefits shown in the Benefit Schedule will only be paid once per Critical Illness for each Covered Person, unless a Recurrence Benefit is available. Following payment of a Cancer Benefit or a Cancer Recurrence Benefit, a period of 30 days must be satisfied before payment of any other Cancer Benefit;
2) Vascular Benefits shown in the Benefit Schedule will only be paid once per Critical Illness for each Covered Person, unless a Recurrence Benefit is available. Following payment of a Vascular Benefit or a Vascular Recurrence Benefit, a period of 30 days must be satisfied before payment of any other Vascular Benefit; and
3) with the exception of Vascular and Cancer Benefits, there is no period of time to be satisfied before payment of any other Critical Illness Benefit.

**Recurrence Benefit:**
We will pay a Recurrence Benefit as shown in the Benefit Schedule if a Covered Person receives a Diagnosis of a recurrence of a Critical Illness previously paid under the Policy.

Subject to the Coverage Maximums shown in the Benefit Schedule:

1) the condition must be listed as a Recurrence Benefit in the Benefit Schedule; and
2) the Diagnosis of recurrence must be made 6 months or more following the initial Critical Illness Diagnosis.

We will not pay more than one Recurrence Benefit per Critical Illness for the Covered Person during the Covered Person’s lifetime.

**Skin Cancer Benefit:**
We will pay the Skin Cancer Benefit Coverage Amount if the Covered Person is Diagnosed with Skin Cancer.

The Skin Cancer Benefit is payable once per each Covered Person’s lifetime.

**Health Screening Benefit:**
For each day a Covered Person has one or more of the screening tests for Critical Illness listed below, not to exceed one day per calendar year, We will pay the Health Screening Benefit stated in the Schedule. The amount stated is the total amount payable in any calendar year regardless of the number of tests or days of tests during that calendar year. A screening test includes any of the following:

1) abdominal aortic aneurysm ultrasound;
2) blood test for triglycerides;
3) bone marrow testing;
4) bone density screening;
5) breast ultrasound;
6) CA 15-3 (blood test for breast cancer);
7) CA 125 (blood test for ovarian cancer);
8) carotid ultrasound;
9) CEA (blood test for colon cancer);
10) cervical cancer screening;
11) chest x-ray;
12) colonoscopy;
13) CT angiography;
14) ECG/EKG;
15) double contrast barium enema;
16) fasting blood glucose test;
17) flexible sigmoidoscopy;
18) hemoccult stool analysis;
19) lipid panel;
20) mammography;
21) pap smear;
22) PAD ultrasound
23) PSA (blood test for prostate cancer);
24) serum cholesterol test (for HDL and LDL levels);
25) SPEP (blood test for myeloma);
26) stress test (on a bicycle or treadmill);
27) thermography; or
28) any other generally medically accepted cancer-screening test.

We will pay:

1) regardless of the result of any test; and
2) provided the test was conducted while the Covered Person was covered under the Policy.

## EXCLUSIONS

**Exclusions:**
No benefits are payable under this Certificate for Critical Illness that results from or is caused by:

1) suicide, attempted suicide or intentionally self-inflicted injury, whether sane or insane;
2) war or act of war, declared or undeclared;
3) the Covered Person's participation in a felony, riot or insurrection;
4) the Covered Person's engaging in any illegal occupation; or
5) the Covered Person's service in the armed forces or units auxiliary to them.

## CLAIM PROVISIONS

### Notice of Claim
Notice of claim may be given to Anthem Insurance Companies, Inc., 220 Virginia Avenue, Indianapolis, IN 46204, within 20 days after the start of any loss covered by the Policy, or as soon as reasonably possible. Notice given by or on behalf of a Covered Person to Us, or to Our authorized agent, with information sufficient to identify the Covered Person, shall be notice to Us.

Failure to give notice within this time frame will not invalidate nor reduce any claim.

### Claim Forms
When We receive Notice of Claim, We will send claim forms. If the claimant does not receive the forms within 10 working days after Notice of Claim is sent, Proof of Loss may be sent to Us without waiting to receive the claim forms.

### Proof of Loss
The claimant must send proof of loss to Us. This proof must be provided within 90 days after the date of the loss. If it is not reasonably possible to give proof in this time, proof must be provided as soon as reasonably possible. Proof of loss may not be given more than one year after the time proof is otherwise required, unless the claimant is legally incapacitated.

### Physical Examinations and Autopsy
We, at our own expense, shall have the right and opportunity to have:

1) a Covered Person for whom a claim is made examined by a Physician or Medical Professional of Our choice during the pendency of a claim as often as reasonably required; and
2) an autopsy conducted for a Covered Person for whom a claim is made in case of death, where not prohibited by law.

### Time of Payment of Claims
Benefits payable under the Policy will be paid within 15 working days for electronic claims, or 30 calendar days for paper claims, after Our receipt of due Proof of Loss.

### Payment of Claims
All benefits are payable to You. Any benefits unpaid at the time of Your death will be paid to:

1) Your designated beneficiary(ies); or if none, then to
2) Your estate.

### Beneficiary Designation
In the event of Your death, You should designate one or more beneficiaries to receive any benefits under the Policy that are unpaid at the time of Your death. Beneficiary records will be kept by the Policyholder, plan administrator or the office/system where beneficiary records for the Policy are kept. The most current beneficiary designation in effect under a Prior Policy will be accepted as a beneficiary designation under the Policy until changed (if applicable).

Certain states are community property states. If You live in a community property state and designate someone other than Your Spouse or Partner as a beneficiary, state law may require that Your Spouse or Partner consent to such designation. If spousal consent to the designation is not obtained, then such designation may not be effective. Community property states as of the Policy Effective Date include: Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin.

### Change of Beneficiary
The beneficiary may be changed at any time by You or Your assignee (if You assigned this insurance). To make a change, a request should be provided to the Policyholder, plan administrator or to the office/system where beneficiary records for the Policy are kept. If it is not known where the records are kept, then the request may be provided to Us. When received by the Policyholder, plan administrator, office/system where beneficiary records for the Policy are kept or Us, the change will take effect as of the

date the request is signed. The change will not apply to any payments or other action taken by Us before the request was received.

The right to change of beneficiary is reserved to You, and the consent of the beneficiary or beneficiaries shall not be requisite to any change in beneficiary, unless the current beneficiary designation is irrevocable.

**Claim Denial**
If a claim for benefits is wholly or partly denied, the claimant will be furnished with written notification of the decision. This written notification will:

1) give the specific reason(s) for the denial;
2) make specific reference to the Policy provisions on which the denial is based;
3) provide a description of any additional information necessary to perfect a claim and an explanation of why it is necessary; and
4) provide an explanation of the review procedure.

**Claim Appeal**
On any claim, the claimant or his or her representative may appeal to Us for a full and fair review. To do so, the claimant:

1) must submit a written request for review within:
    a) 180 days of receipt of Claim Denial if the claim requires Us to make a determination of a Critical Illness or other loss; or
    b) 60 days of receipt of Claim Denial if the claim does not require Us to make a determination of a Critical Illness or other loss; and
2) may request copies of all documents, records, and other information relevant to the claim; and
3) may submit written comments, documents, records and other information relating to the claim.

We will respond in writing with Our final decision on the claim.

**Overpayment Recovery**
We have the right to recover from You or the recipient of benefits any amount that We determine to be an overpayment. You or the recipient of benefits has the obligation to refund to Us any such amount.

If benefits are overpaid on any claim, You or the recipient of benefits must reimburse Us within 90 days.

If reimbursement is not made in a timely manner, We have the right to:

1) recover such overpayments from:
    a) You;
    b) any other person to or for whom payment was made; or
    c) Your estate;
2) reduce or offset against any future benefits payable to You or Your survivors until full reimbursement is made;
3) refer the unpaid balance to a collection agency; and
4) pursue and enforce all legal and equitable rights in court.

## GENERAL PROVISIONS

**Entire Contract**
The Policy, the Policyholder's signed application, this Certificate and any riders, endorsements or other attached papers make up the entire contract of insurance between the Policyholder and Us.

**Statements**
All statements made by the Policyholder or any Covered Person are considered representations and not warranties. No statement made by a Covered Person will be used to deny a claim or rescind coverage unless a copy of the statement is furnished to the Covered Person, his or her beneficiary or personal representative.

**Time Limit on Certain Defenses**
Absent a showing of intentional fraud, no statement concerning insurability made by any Covered Person shall be used to contest the validity of the insurance for which the statement was made after this Policy has been in force for two years. In order to be used, the statement must be in writing and signed by the person making the statement. However, We are not precluded at any time from asserting defenses based upon the person's ineligibility for coverage under this Policy, or upon other provisions in the Policy.

**Legal Actions**
No legal action may start:
1) until 60 days after Proof of Loss has been given;
2) more than 3 years after the time proof of loss is required to be given; unless otherwise required by law in Your or the claimant's jurisdiction of residence.

**Misstatement of Age or Tobacco Class**
If the age or tobacco class of any Covered Person has been misstated:
1) the premium may be adjusted; and
2) the true facts will be used to determine if, and for what amount, coverage should have been in force.

**Assignment**
You have the right to absolutely assign Your rights and interest under the Policy including, but not limited to, the following:
1) the right to make any contributions required to keep the insurance in force; and
2) the right to name and change a beneficiary.

We will recognize any absolute assignment made by You under the Policy,
provided:
1) it is duly executed; and
2) a copy is acknowledged and on file with Us.

We and the Policyholder assume no responsibility:
1) for the validity or effect of any assignment; or
2) to provide any assignee with notices which We may be obligated to provide to You.

You do not have the right to collaterally assign his/her rights and interest under the Policy.

**Insurance Fraud**
Insurance fraud occurs when any person and/or the Policyholder provide Us with false information or file a claim for benefits that contains any false, incomplete or misleading information with the intent to injure, defraud or deceive Us. It is a crime if a person and/or the Policyholder commit insurance fraud. We will use all means available to Us to detect, investigate, deter and prosecute those who commit insurance fraud. We will pursue all available legal remedies if a person and/or the Policyholder perpetrate insurance fraud.

**Conformity with State and Federal Laws**
Any provision of the Policy that is contrary to the law of the jurisdiction in which it is delivered or with any other applicable law is amended to meet the minimum requirements of the law.

**Time Periods**
Unless otherwise specifically stated, all time periods begin and end at 12:01 A.M., Standard Time at the place where the Policy is delivered.

**Workers' Compensation**
The Policy does not replace Workers' Compensation or affect any requirement for Workers' Compensation coverage.

**Unpaid Premium**
Upon the payment of a claim, any premium then due and unpaid may be deducted from the claim payment.

**Policy Interpretation**
We have discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

A.L., Case No.: CC26-5992

Plaintiff,

v.

ANTHEM INSURANCE COMPANIES, INC.,

Defendant.
_______________________________________/

**SUMMONS SERVICE ON A CORPORATION**
**IMPORTANT**

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Request for Admission, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**ANTHEM INSURANCE COMPANIES, INC.**
**C T CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**Health and Medicine Law Firm PLLC**
*Counsel for Plaintiff*
8925 SW 148 Street, Suite 216
Miami, FL 33176
Ph: 305-677-2296
Fax: 305-677-2306

Service email:
admin@healthandmedicinelawfirm.com
Attorney emails:
msanti@healthandmedicinelawfirm.com

DATED ON OCTOBER 20TH 2026.

Brandon J. Patty
CLERK OF THE CIRCUIT COURT

(SEAL)

By: Megan Baele
Deputy Clerk

IN THE CIRCUIT/COUNTY COURT OF FLORIDA, SEVENTH JUDICIAL CIRCUIT, IN AND FOR FLAGLER, PUTNAM, ST. JOHNS AND VOLUSIA COUNTIES

# UNIFORM CASE MANAGEMENT ORDER

**NOTICE: The deadlines referenced in this Order will be strictly enforced.**

This Case Management Order is issued in accordance with Fla. R. Civ. P. 1.200 and Administrative Order(s) of the Seventh Judicial Circuit Court. The deadlines referenced herein apply in conjunction with the trial date specified in the Order Setting Trial.

## A. CASE DESIGNATION

All civil cases will be assigned a designation as follows: Civil cases in which trials by jury are demanded are designated as "General," except those cases in which all defendants have been defaulted. Civil cases designated as "Complex" pursuant to Rule 1.201, Fla. R. Civ. P., are exempted from the requirements of this Order and will follow the procedures outlined in the Rule. All other civil cases are designated as "Streamlined." Parties may move for redesignation in accordance with Fla. R. Civ. P. 1.200 (c)(1). Civil actions specified in Fla. R. Civ. P. 1.200(a)(1-18) are likewise exempted from the requirements of this order.

## B. PROJECTED TRIAL PERIOD

The projected trial period for "General" cases will be no later than eighteen (18) months from case filing. The projected trial period for "Streamlined" cases will be no later than twelve (12) months from case filing. The parties may move the Court to fix a trial period on or before the projected trial period. For cases in which no trial order has been issued, the parties seeking affirmative relief must notify the Court no later than seventy-five (75) days before the expiration of the projected trial period that no trial order has been issued.

## C. SERVICE OF PROCESS

Plaintiff(s) are required to serve each defendant with initial process and pleading no later than one hundred twenty (120) days from case filing as provided in Fla. R. Civ. P. 1.070(j). Proof of service of process is to be promptly filed with the Clerk of Court. Motions for extension of time to complete service of process must be filed no later than ten (10) days prior to the expiration of the initial time allotted for service. The motions must specify the reasons why service could not be performed within 120 days and what attempts had been made at service during that period. In its discretion, the presiding judge may grant the plaintiff(s) an additional ninety (90) days to serve any remaining defendant(s). After the expiration of the time for service, including any extensions, any unserved defendant(s) may be dismissed from the action without further notice.

## D. ADDING NEW PARTIES

The deadline for adding new parties to an action is 120 days after the completion of service of process on the initial defendants in cases designated as "General" and 90 days after the completion of service of process on the initial defendants in cases designated as "Streamlined." Parties may not be added to actions after these deadlines absent a showing of good cause.

## E. OBJECTIONS TO PLEADINGS

Motions objecting to pleadings must be called up for hearing no later than 120 days after the filing of the motion. Motions objecting to pleadings not called up for hearing within the time specified herein, absent a showing of good cause, may be deemed waived or abandoned.

## F. DISCOVERY/DISCLOSURE DEADLINES

All discovery is to be completed according to the following schedule:

| Action or Event | General | Streamlined |
|---|---|---|
| Mandatory Initial Disclosures | As provided in Fla. R. Civ. P. 1.280(a) | As provided in Fla. R. Civ. P. 1.280(a) |
| Disclosure of expert witnesses | 120 days before docket sounding for parties seeking affirmative relief; 90 days before docket sounding for parties not seeking affirmative relief | 90 days before docket sounding for parties seeking affirmative relief; 60 days before docket sounding for parties not seeking affirmative relief |
| Disclosure of fact witnesses | 60 days before docket sounding | 60 days before docket sounding |
| Service of written discovery requests | 45 days before docket sounding | 45 days before docket sounding |
| Completion of all discovery | 10 days before docket sounding | 10 days before docket sounding |

## G. DISPOSITIVE MOTIONS

Dispositive motions must be filed and served no later than 120 days prior to the scheduled or projected trial period for "General" cases and 90 days prior to the scheduled or projected trial period for "Streamlined." cases. Motions for summary judgment and responses in opposition must comply with the deadlines set forth in Fla. R. Civ. P. 1.510. Movants must promptly call up dispositive motions for hearing, but no sooner than the time specified in Rule 1.510. Replies to responses in opposition to dispositive motions are only permitted upon leave of Court.

## H. EXPERT WITNESS MOTIONS

Expert witness-related motions or objections (e.g., *Daubert* motions) must be filed no later than 60 days prior to the start of the scheduled or projected trial period for "General" cases and forty-five (45) days prior to the start of the specified or projected trial period for "Streamlined" cases.

## I. PRETRIAL MOTIONS

All pretrial motions, other than dispositive motions and motions directed at expert witnesses, must be filed no later than thirty (30) days prior to the trial date. Pretrial motions filed within 30 days of trial will not be considered if predicated on matters the movant knew or should have known with the exercise of reasonable diligence at least 30 days prior to the trial date. Compliance by counsel (not staff) with the conferral requirements in Fla. R. Civ. P. 1.202 is required. Failure to comply with conferral requirements may result in summary denial of motions. Because of busy court calendars, hearing time may not be available to consider motions filed close to the deadline. The inability of a party to obtain hearing time will generally not constitute grounds for a continuance of the trial.

## J. MEDIATION

Unless excused by the Court or excluded pursuant to Fla. R. Civ. P. 1.710(b), mediation is to be conducted in all cases. Mediation must be concluded, and a report filed prior to docket sounding.

## K. EXTENSIONS/MODIFICATIONS OF DEADLINES

The deadlines specified herein will be strictly enforced unless modified by Court order. The parties may submit an agreed order to extend disclosure and/or discovery deadlines; however, all remaining deadlines will remain in place absent a Court order. Continuances of deadlines are strongly discouraged.

## L. SERVICE OF THIS ORDER

Plaintiff is required to serve a copy of this Order on all other parties and file a notice of service with the Clerk within 30 days of the date of its issuance.

**DONE AND ORDERED** in Flagler, Putnam, St. Johns, and Volusia counties.

**Leah R. Case**
**Chief Judge**

Effective: January 1, 2025
Adopted: December 2024

IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

A.L.,

Plaintiff,

v.

ANTHEM INSURANCE COMPANIES, INC.,

Defendant.

Case No. CC26-5992

**DEFENDANT'S NOTICE OF APPEARANCE AND DESIGNATION OF ELECTRONIC MAIL ADDRESS PURSUANT TO RULE 2.516**

**PLEASE TAKE NOTICE THAT** the undersigned attorney, Genna A. Conti, Esq., hereby enters this Notice of Appearance as counsel of record for Defendant, ANTHEM INSURANCE COMPANIES, INC., in the above-mentioned cause and requests that all copies of notices to the Defendants be sent to the address below.

The undersigned hereby designates, in accordance with Rule 2.516 of the Florida Rules of Judicial Administration, the following electronic mail address for service of all documents upon Defendant in this proceeding: gconti@fbtgibbons.com.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2026, pursuant to Fla. R. Jud. A. 2.516(b)(1), a true and correct copy of the foregoing document has been electronically filed and served using the Florida Court e-filing Portal and e-Service System to all counsel of records.

***/s/ Genna A. Conti***
Genna A. Conti
Florida Bar No.: 1074743
FBT Gibbons LLP
2054 Vista Pkwy #400
West Palm Beach, FL 33411
Telephone: (561) 537-7600
Email: gconti@fbtgibbons.com

**IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA**

A.L., )
Plaintiff, )
)
v. ) CASE NO.: CC26-5992
)
ANTHEM INSURANCE COMPANIES, INC. )
Defendant. )

**UNOPPOSED MOTION FOR EXTENSION OF TIME FOR DEFENDANT ANTHEM INSURANCE COMPANIES, INC. TO ANSWER, MOVE, OR OTHERWISE RESPOND TO PLAINTIFF'S COMPLAINT**

Defendant Anthem Insurance Companies, Inc. ("Anthem"), pursuant to the applicable Florida Rules of Civil Procedure, hereby moves this Court for the entry of an order permitting Anthem an additional 14 days to file its response to Plaintiff's Complaint for Declaratory Judgment for Recovery of Contractual Insurance Benefits Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) ("Plaintiff's Complaint"), and states as follows:

1. Plaintiff's Complaint was filed on or about October 20, 2026, and was purportedly served on Anthem via its registered agent in Indianapolis, Indiana on or about October 21, 2026. This service date would make Anthem's current deadline to answer, move, or otherwise respond to Plaintiff's Complaint November 10, 2026.

2. After referral of the summons and Complaint from the registered agent, the undersigned counsel solicited and received the consent of Plaintiff's counsel for an extension of time to answer, move, or otherwise respond to Plaintiff's Complaint.

3. Plaintiff's counsel agreed to a 14-day extension of time to answer, move, or otherwise respond to Plaintiff's Complaint, which would make Anthem's response to Plaintiff's Complaint due on or before November 24, 2026. This extension will allow Anthem time to review the case information to respond appropriately to Plaintiff's Complaint.

4. With Plaintiff's counsel's gracious consent to a 14-day extension, it is respectfully requested that this Court enter the proposed order submitted herewith to allow the requested time to respond.

5. This application is made in advance of the expiration of the original time to answer. The requested relief is sought in good faith and is not anticipated to cause any untoward delay in the proceedings of this matter toward eventual resolution.

Dated: November 10, 2026
West Palm Beach, FL

Respectfully submitted,

*/s/Genna A. Conti*
Genna A. Conti
Florida Bar No. 1074743
FBT GIBBONS LLP
2054 Vista Pkwy #400
West Palm Beach, FL 33411
Telephone: (561) 537-7600
Email: gconti@fbtgibbons.com

*Attorney for Defendant Anthem Insurance Companies, Inc.*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct of the above and foregoing was served via the Florida E-service Portal & to all parties of record and the e-mail addresses designated therein, on November 10, 2026.

/s/Genna A. Conti

**IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT**
**IN AND FOR ST. JOHNS COUNTY, FLORIDA**

A.L.,
Plaintiff,

v. CASE NO.: CC26-5992

ANTHEM INSURANCE COMPANIES, INC.
Defendant.

**ORDER GRANTING UNOPPOSED MOTION FOR EXTENSION OF TIME FOR DEFENDANT ANTHEM INSURANCE COMPANIES, INC. TO ANSWER, MOVE, OR OTHERWISE RESPOND TO PLAINTIFF'S COMPLAINT**

The Court, having reviewed Defendant Anthem Insurance Companies, Inc.'s Unopposed Motion for Extension of Time to Answer, Move, or Otherwise Respond to Plaintiff's Complaint and being duly advised, hereby GRANTS Defendant's Motion extending Defendant's time to answer, move, or otherwise respond to Plaintiff's Complaint from November 10, 2026 up to, and including November 24, 2026.

DONE and ORDERED in Chambers, in St. Johns County, Florida, on 13 day of November, 2026.

e-Signed 11/13/2026 11:32 AM CC26-5992
BENJAMIN J. RICH, COUNTY JUDGE

cc: All counsel of record.

IN THE COUNTY COURT OF THE 7th JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

A.L., Case No.: CC26-5992

Plaintiff,

vs.

ANTHEM INSURANCE COMPANIES, INC.,

Defendant.
_______________________________________/

**PLAINTIFF'S NOTICE OF SERVICE OF INITIAL DISCLOSURES**

Plaintiff, A.L., by and through undersigned counsel, hereby gives notice to the Court and all parties of the service of the following:

1. Plaintiff, A.L.'s Rule 1.280(a) Initial Disclosures.

Dated: November 13, 2026

Respectfully submitted,

**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8925 SW 148 Street, Suite 216
Miami, FL 33176
Phone: (305) 677-2292
Fax: (305) 677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

**By: /s/ Maria T. Santi**
MARIA T. SANTI, ESQUIRE
Florida Bar No.: 117564

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail and/or E-Service compliant with Rule of Judicial Administration 2.516 delivery this 13th day of November 2026 to all parties and counsel of record listed in the e-portal.

/s/ Maria T. Santi
Maria T. Santi, Esquire